**STATE of Missouri, Respondent,**

v.

**Kevin JOHNSON, Appellant.**

No. SC 89168.

Supreme Court of Missouri,
En Banc.

May 26, 2009.

Rehearing Denied June 30, 2009.

Deborah B. Wafer, Office of Public Defender, St. Louis, MO, for Appellant.

Chris Koster, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

## I. Introduction

A jury found Kevin Johnson (Appellant) guilty of one count of first-degree murder, pursuant to section 565.020,[1] for killing Sgt. William McEntee and recommended the death penalty. The trial court adopted the jury's recommendation and sentenced Appellant to death. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## II. Facts[2]

Appellant had an outstanding warrant for a probation violation resulting from a misdemeanor assault. Around 5:20 in the evening of July 5, 2005, Kirkwood police, with knowledge of the warrant, began to investigate a vehicle believed to be Appellant's at his residence in the Meacham Park neighborhood. The investigation was interrupted at 5:30 when Appellant's younger brother had a seizure in the house next door to Appellant's residence. The family sought help from the police, who provided assistance until an ambulance and additional police, including Sgt. McEntee, arrived. Appellant's brother was taken to the hospital, where he passed away from a preexisting heart condition. Appellant was next door during this time, and the police suspended their search for Appellant and never saw Appellant.

After the police left, Appellant retrieved his black, nine millimeter handgun from his vehicle. When talking with friends that evening, Appellant explained his brother's death as, "that's f____ up, man. They wasn't trying to help him, that he was too busy looking for me." Around 7:30, two hours after Appellant's brother had the seizure, Sgt. McEntee responded to a report of fireworks in the neighborhood and Appellant was nearby. As Sgt. McEntee spoke with three juveniles, Appellant approached Sgt. McEntee's patrol car and squatted down to see into the passenger window. Appellant said "you killed my brother" before firing his black handgun approximately five times. Sgt. McEntee was shot in the head and upper torso, and one of the juveniles was hit in the leg. Appellant reached into the patrol car and took Sgt. McEntee's silver .40 caliber handgun.

Appellant proceeded to walk down the street with the black and silver handguns. He then saw his mother and her boyfriend. Appellant told his mother, "that m____ f____ let my brother die, he needs to see what it feel[s] like to die." His mother replied, "that's not true." Appellant left his mother and continued to walk away.

Meanwhile, Sgt. McEntee's patrol car rolled down the street, hit a parked car, and then hit a tree before coming to rest. Sgt. McEntee, alive but bleeding and un-

---

1. All statutory references are to RSMo 2000, unless otherwise noted.

2. The facts are reviewed in the light most favorable to the verdict. *State v. Johnson,* 207 S.W.3d 24, 31 (Mo. banc 2006).

able to talk, got out of the patrol car and sat on his knees. Appellant reappeared, shot Sgt. McEntee approximately two times in the head, and Sgt. McEntee collapsed onto the ground. Appellant also went through Sgt. McEntee's pockets.

Sgt. McEntee was shot a total of seven times in the head and upper torso. Six of the wounds were serious but did not render Sgt. McEntee unconscious or immediately incapacitated. One wound was a lethal injury that caused Sgt. McEntee's death. All seven wounds were from a nine millimeter handgun.

Appellant left the scene cursing and drove to his father's house. Appellant spent three days at a family member's apartment before arrangements were made for Appellant to surrender to a family member who was a police officer.

Appellant was indicted on one count of first-degree murder, one count of first-degree robbery, one count of first-degree assault, and three counts of armed criminal action. The murder count was severed from the other counts. Appellant's first trial ended with a hung jury in the guilt phase. In this trial, the jury deliberated for four hours before finding Appellant guilty of first-degree murder. In the penalty phase, the jury spent four hours deliberating and found the following aggravating factors present: (1) "the defendant by his act of murdering Sgt. William McEntee knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person;" (2) "the murder of Sgt. William McEntee 'DID' involve depravity of mind, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman;" and (3) "the murder of Sgt. William McEntee was committed against a peace officer while engaged in the performance of his official duty."

## III. Standard of Review

On direct appeal, this Court reviews a death penalty conviction for prejudice, not mere error, and will reverse the trial court's decision only when the error was so prejudicial that the defendant was deprived of a fair trial. *State v. Johnson,* 207 S.W.3d 24, 34 (Mo. banc 2006) (*Johnson I* ). Prejudice exists when there is a "reasonable probability that the trial court's error affected the outcome of the trial." *Id.* Non-preserved issues are reviewed for plain error, where the error resulted in manifest injustice or a miscarriage of justice. *Id.* Evidence is reviewed in the light most favorable to the verdict and is reviewed for abuse of discretion. *State v. Johns,* 34 S.W.3d 93, 103 (Mo. banc 2000).

Appellant raises eleven points on appeal. Each point is denied.

## IV. Point One: Juror Non-disclosure

In the first point, Appellant argues the trial court erred in overruling the motion for new trial because juror Broome failed to disclose in voir dire and at trial that she knew a State's witness, Det. Scognamiglio. Appellant learned after the trial that Broome knew Scognamiglio and raised the issue in a motion for new trial. The record shows that during voir dire, the State read the list of police witnesses, including Scognamiglio, and asked:

Are any of those names familiar to anybody as County police officer?

Anybody—let me start back with the jury box. Anybody know, friends with County police officers—or I won't even limit it to County. Close friends with police officers, law enforcement officers.

Broome disclosed that her stepbrother is a police officer. She did not disclose she knew Scognamiglio. At the post-trial

hearing, Broome stated that she knew Scognamiglio from working with his wife. She said she did not respond at voir dire or during trial because:

it didn't register to me because he listed off a bunch of people, and I really didn't put two and two together because I hadn't seen him in over at least two and a half years. And when I seen him on the stand, I didn't—I'm like, oh. I didn't know what I could do. I had no idea. If I should have said, I didn't know.

Broome further testified at the hearing that she told her husband, "I had seen Don [Scognamiglio] there, and he was one of the ones who had brought evidence in that seemed to be the same evidence as the first time we had seen the previous pictures or trial."

The trial court overruled the motion and found Broome's conduct was not non-disclosure or, at worst, was unintentional non-disclosure. The trial court made the following findings in a written order:

Juror # 1 [Broome] was asked, after the list of witnesses was read: "Are any of those names familiar to anyone as county police officers?["] The juror did not respond to that. The credible evidence before this court is that the juror did not know Don Scognamiglio as a county police officer, although she had been aware that he was a police officer. Her relationship with the officer was peripheral to her familiarity with his wife. She never socialized with the officer and his wife but only knew him as one who occasionally appeared at work. The court finds the juror's denial that the mention of his name in the midst of a list of 12 officers did not register with her as someone she knew was credible. She had not seen or had contact with him for a few years.

The remainder of the question by the prosecutor to which there was a response sought was if "Anybody—let me start back with the jury box. Anybody know, friends with County police officers—or I won't even limit it to County. Close friends with police officers, law enforcement officers." There is no credible evidence before this court that the juror was close friends with any officers including the County Detective other than the friendships the juror disclosed during voir dire.

Clearly, even if the court were to find that the juror's conduct could be interpreted as non-disclosure, which it does not, there is no credible evidence that the non-disclosure would be intentional. At the very worst it would [be] unintentional. Also there is no credible evidence before the court that the Defendant was prejudiced by any non-disclosure that would have resulted.

■ Juror non-disclosure during voir dire requires a two-prong analysis. *State v. Mayes,* 63 S.W.3d 615, 625 (Mo. banc 2001). First, non-disclosure occurs when the juror reasonably can "comprehend the information solicited by the question asked." *Id.* A response is reasonable based on the language and context, and the question's clarity is subject to *de novo* review. *Nadolski v. Ahmed,* 142 S.W.3d 755, 765 (Mo.App.2004). Second, it must be determined whether the non-disclosure is intentional or unintentional. *Mayes,* 63 S.W.3d at 625. Intentional non-disclosure occurs when the juror "actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable." *Id.* When material information is intentionally withheld, bias and prejudice are presumed. *Id.* Unintentional non-disclosure involves an insignificant or remote experience, misunderstanding the ques-

tion, or disconnected information. *Williams v. Barnes Hosp.*, 736 S.W.2d 33, 36–37 (Mo. banc 1987). For unintentional non-disclosure, a new trial is warranted when the verdict is prejudicially influenced. *Mayes*, 63 S.W.3d at 625. The trial court has discretion to grant a new trial. *Id.*

Broome was not instructed at any time what to do in the unlikely event that she recognized a witness during trial. While Broome should have brought this to the trial court's attention, her silence is not unreasonable.

The trial court's written findings, made after observing the trial and hearing the evidence, are supported by evidence in the record. The trial court did not abuse its discretion in overruling the motion. The point is denied.

## V. Point Two: *Batson* Challenge

■ In the second point, Appellant argues the trial court erred in overruling a *Batson*[3] challenge for juror Cottman. The State used a peremptory challenge to strike Cottman and Appellant made a *Batson* challenge. In response to the *Batson* challenge, the State's race-neutral reasons were Cottman's unwillingness to answer death penalty questions and her role as a foster parent with Annie Malone Children's Home, which provided services to Appellant as a youth. Appellant's only response was that another juror was a foster parent. The trial court allowed the strike.[4] Appellant preserved this point by

---

**3.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**4.** The relevant portion of the transcript is:

MR. McCULLOCH [State]: Judge, I note that Cottman, I felt when we were questioning her in small groups was not antagonistic towards me but not all that willing to answer the questions regarding the death penalty and other issues surrounding that.

*Also as a development in the large group, she was a foster parent for the Annie Malone Children's Home.* She indicated that she still sees a lot of the kids that she was a foster parent for during that time now that they have grown up some. I don't know what the age group is, but they were around the Defendant's age based on her time frame of when she said she was a foster parent down there. *And since there will be evidence in this case, particularly if we get to a second half, there will be evidence that the Defendant was at least for some period of time in Annie Malone's custody, I don't want anybody associated with Annie Malone. I assume she has probably— rightly so I suggest, but a very high opinion of Annie Malone, anything that went on there. I think that's not something that would be favorable to our position regarding the Defendant's time away from home.*

THE COURT: Any response from defense?

MS. KRAFT [Defense]: *I would note for the record that Juror Robert Bayer, who is a white male, also stated that he was a foster parent at* one point in time, and the State has not struck Mr. Mayer.

MR. McCULLOCH: Mayer or Bayer?

MS. KRAFT: Bayer, I'm sorry. Mr. Bayer.

THE COURT: I don't recall that. Is Annie Malone in some way connected with the Defendant in this case?

MS. KRAFT: Yes, he spent some time there. He spent some time at Annie Malone's.

MR. McCULLOCH: *With Mr. Bayer, he was a foster parent for a brief period of time, in fact for St. Vincent's. No connection to Annie Malone. And that I think is a completely different situation.*

THE COURT: Okay. Anything else from the defense?

MS. KRAFT: In addition, I would state that Mr. Fenton, who was one of the—no, I'm sorry, he's not in the alternate group. Never mind.

THE COURT: *Okay. I don't believe—I can't recall that there were any other jurors who were foster parents for Annie Malone or connected with Annie Malone other than the juror who's not on this—either the primary panel or the alternate panel, Juror 77, who had some connection with Annie Malone, but I think he was the only other one with Annie Malone, am I correct?*

MS. KRAFT: I believe so.

THE COURT: *Okay. The motion to strike for cause will be granted. I will allow that strike. I believe there is a racially-neutral basis for the strike.*

objecting at trial and raising the issue in the motion for new trial.

 A peremptory strike may not be based on an improper purpose, such as race or gender, and is objected to by a *Batson* challenge. *Johnson I*, 207 S.W.3d at 35. A *Batson* challenge has three components: (1) the defendant must object that the state's peremptory challenge is based on an improper purpose, (2) the state has the burden to prove a race-neutral reason for the strike, and (3) the defendant has the burden to prove the reason is pretextual. *State v. Edwards*, 116 S.W.3d 511, 524 (Mo. banc 2003).

 To determine if pretext exists, this Court considers a non-exclusive list of factors including: the explanation in light of the circumstances; similarly situated jurors not struck; the relevance between the explanation and the case; the demeanor of the state and excluded venire members; the court's prior experiences with the prosecutor's office; and objective measures relating to motive. *Id.* at 527. The trial court's ruling is reversed only for clear error. *Id.* at 525.

Failing to raise a *Batson* challenge with the trial court does not preserve the argument for appeal. *State v. Strong*, 142 S.W.3d 702, 713 (Mo. banc 2004). However, when the non-preserved claim involves a constitutional issue, it is reviewed for plain error. *Id.* at 714.

During voir dire, Appellant argued the State's explanation for striking Cottman was pretextual because another member of the venire was also a foster parent but not struck. A review of the record shows no other venire member was involved with Annie Malone Children's Home, which was significant because it previously provided services to Appellant. The trial court did

not err in finding the explanation was not pretextual.

Because the trial court found one race-neutral reason to strike Cottman, it is unnecessary to review Appellant's argument that Cottman's unwillingness to answer death qualification questions was pretextual. *See State v. Taylor*, 18 S.W.3d 366, 370 n. 6 (Mo. banc 2000).

Appellant also argued that the prosecutor's demeanor and that the trial court's previous experience with the prosecutor's office warrants pretextual behavior. As noted above, the prosecutor's decision to strike Cottman was not pretextual. There is no evidence that the State engaged in improper behavior to constitute a *Batson* violation regarding Cottman. A previous *Batson* violation by the same prosecutor's office does not constitute evidence of a *Batson* violation in this case, absent allegations relating to this specific case.

The trial court did not err. The point is denied.

## VI. Point Three: Trial Court Errors

In the third point, Appellant argues: A) the trial court erred in overruling the motion for judgment of acquittal; B) the trial court erred in submitting the first-degree murder jury instruction because section "565.002(3)'s definition of deliberation, 'cool reflection for any amount of time no matter how brief,' reduces the distinction between first and second degree murder to imperceptibility;" and C) the trial court committed plain error in: 1) allowing the State to "[r]epeatedly argu[e] that [Appellant's] conscious decision to shoot was deliberation, Prosecutor McCulloch misled the jury, contravened the law, and created manifest injustice: a conscious decision to

MR. McCULLOCH: Peremptory strike, Judge.

(Emphasis added).

kill is *second* degree murder" (emphasis in original); 2) "allowing argument that the jury had to acquit [Appellant] of first-degree murder to consider second-degree murder;" and 3) submitting "[i]nstruction 5, the first-degree murder verdict-director, [which] failed to require unanimity as to each element of first-degree murder."

### A. Motion for Judgment of Acquittal

 Appellant alleges the trial court erred in overruling the motion for judgment of acquittal. A sufficiency of the evidence argument is reviewed to determine if a reasonable juror had enough evidence to find the defendant guilty beyond a reasonable doubt. *State v. Salter*, 250 S.W.3d 705, 710 (Mo. banc 2008). Evidence and inferences favorable to the state are accepted, and contrary evidence and inferences are disregarded. *Id.*

The record shows Appellant retrieved his gun from his vehicle after his brother was taken to the hospital and expressed his belief that the police did not help his brother because they were focused on finding him. Two hours later, Appellant approached Sgt. McEntee's patrol car, squatted down to see into the window, and said "you killed my brother" before firing his handgun approximately five times at Sgt. McEntee's head and upper body. Appellant took Sgt. McEntee's silver gun and walked down the street with both guns. He then saw his mother and told her "that m___ f___ let my brother die, he needs to see what it feel[s] like to die." After leaving his mother, Appellant walked around

the neighborhood and came to Sgt. McEntee, whose patrol car had rolled down the street and hit a tree. Appellant approached Sgt. McEntee and shot him two more times in the head. Appellant drove to his father's house and later went to a family member's apartment for several days until he surrendered to police. The trial court did not err in overruling the judgment of acquittal as a reasonable juror had sufficient evidence to find Appellant guilty beyond a reasonable doubt.

### B. Distinction between First–Degree and Second–Degree Murder

 Appellant argues that the definition of "deliberation" in the first-degree murder jury instruction reduces the distinction between first-degree and second-degree murder and is unconstitutionally vague. Appellant objected during the instruction conference and raised the point in the motion for new trial. An instructional error is reviewed for an error in submitting the instruction and prejudice. *State v. Zink*, 181 S.W.3d 66, 74 (Mo. banc 2005). MAI instructions are presumed valid. *Id.*

The Court has previously found first-degree murder is distinguished from second-degree murder by deliberation.[5] *Strong*, 142 S.W.3d at 717. Deliberation is defined as a "cool reflection for any length of time no matter how brief." Section 565.002(3).

The first-degree murder instruction[6] provided was based on MAI–CR3d 314.02,

---

**5.** First-degree murder is defined as "knowingly causes the death of another person after deliberation upon the matter," section 565.020.1, and second degree murder is defined as "knowingly causes the death of another person," section 565.021.1.

**6.** First-degree murder jury instruction:
If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 5, 2005, in the County of St. Louis, State of Missouri, the defendant caused the death of Sgt. William McEntee by shooting him, and
Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Sgt. William McEntee, and

which included the statutory definition of "deliberation." The instruction adequately sets out the additional element of deliberation to distinguish first-degree murder. There is also no evidence Appellant was prejudiced.

The statutory definition of "deliberation" is not unconstitutionally vague. This Court has rejected the claim that first-degree murder is unconstitutionally vague for failing to distinguish first-degree and second-degree murder. *See State v. Forrest*, 183 S.W.3d 218, 231 (Mo. banc 2006).

The trial court did not err in submitting the instruction.

### C. Plain Errors

Three of Appellant's arguments were not preserved as Appellant did not object at trial or raise the points in the motion for new trial. These points are reviewed for plain error. *Johnson I*, 207 S.W.3d at 43. Plain error requires a finding of "manifest injustice or miscarriage of justice." *Id.* at 34.

#### 1. Conscious Decision Argument

 Appellant argues the trial court erred in allowing the State, during its closing argument, to:

> blatantly misle[a]d the jury to believe that if [Appellant] consciously or knowingly decided to kill a police officer, he had "coolly reflected" and deliberated. These arguments eliminated deliberation, cool reflection, from the elements the jury had to find to convict [Appellant] of first degree murder.

> Third, that defendant did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,
> then you will find the defendant guilty of murder in the first degree.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must

Appellant also argues "a conscious decision to kill someone, without more, is second degree murder."

The State in its closing argument first defined deliberation as "cool reflection upon the matter for any length of time no matter how brief"[7] and went on to say *"you make a conscious decision to go after somebody and kill them, that is cool reflection."* The State proceeded to use the terms "deliberation," "cool reflection," and "conscious decision" to illustrate Appellant's actions.

 Plain error review of a closing argument not objected to will be considered only if "there is a sound, substantial manifestation, a strong, clear showing, that injustice or miscarriage of justice will result if relief is not given." *Johnson I*, 207 S.W.3d at 49. A conviction is reversed due to an improper closing argument when the argument "had a decisive effect on the jury's determination." *Id.* The burden is on the criminal defendant to show a decisive effect. *Id.* Rarely is plain error relief granted for a closing argument claim, absent an objection, because it may be a strategic decision by counsel. *Id.* The trial court is vested with discretion regarding closing arguments. *Edwards*, 116 S.W.3d at 537. The entire record is considered when interpreting a closing argument, not an isolated segment. *Id.*

The term "conscious decision" is neither an element nor description of first-degree or second-degree murder. *See* sections 565.020, 565.021. Conscious is defined as

> find the defendant not guilty of murder in the first degree.
> MAI–CR3d 314.02.

7. The same definition of "deliberation" is in the jury instruction for first-degree murder, MAI–CR3d 314.02, and the statute defining deliberation, section 565.002(3).

"perceiving, apprehending, or noticing with a degree of controlled thought or observation: recognizing as existent, factual, or true." Webster's Third New International Dictionary, 482 (1993). Decision is defined as "a determination arrived at after consideration." *Id.* at 585.

In the context of the State's entire closing argument, the State argued both deliberation and conscious decision. The State initially defined "deliberation" and in the process of arguing the deliberation element used the terms "deliberation," "cool reflection," and "conscious decision." Although the term "conscious decision" is not used in the instruction, the use of this phrase in closing argument, especially after reciting the actual language of the instruction, was not plain error.[8] Furthermore, it is presumed the jury followed the instruction, *see Tisius v. State,* 183 S.W.3d 207, 217 (Mo. banc 2006), which properly defined "deliberation."

### 2. Acquittal First Argument

Appellant argues that allowing the State to argue "the jury had to acquit [Appellant] of first-degree murder to consider second-degree murder was plain error contrary to law."

The jury instruction for second degree murder provides, "If you *do not find* the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree." MAI–CR3d 314.04 (emphasis added). In closing arguments, the State read the instruction and explained "you're considering Murder in the First Degree, which *is only if you decide that he didn't commit Murder in the First Degree that you even get to Murder in the Second Degree.*" (Emphasis added).

An acquittal first instruction requires the defendant to be acquitted of the greater offense before the lesser offense is considered. An acquittal first instruction is: "[i]f you determine that the defendant is not guilty of the crime of _____ you may consider the lesser included crime of _____." *State v. Allen,* 301 Or. 35, 717 P.2d 1178, 1180 (1986) (citing comments to UCrJI No. 1009, Uniform Criminal Jury Instruction for Lesser Included Offense Order of Deliberation). Thus, if an acquittal is first required, a deadlocked jury could not consider a lesser offense. *State v. Wise,* 879 S.W.2d 494, 517 (Mo. banc 1994) (*overruled* on other grounds by *Joy v. Morrison,* 254 S.W.3d 885 (Mo. banc 2008)). However, an acquittal first argument will be upheld if "the strength of the evidence of deliberation precludes a finding of prejudice." *Tisius,* 183 S.W.3d at 217.

The second-degree murder jury instruction in Missouri, MAI–CR3d 314.04, is not an acquittal first instruction. *Wise,* 879 S.W.2d at 517. The instruction does not require the defendant to be found "not guilty" on the greater offense, first-degree murder, before the lesser-included offense, second-degree murder, is considered. *Id.* Instead, a lesser-included offense may be considered if the jury does "not find the defendant guilty of the greater offense." *Id.* Thus, a lesser-included offense may be considered when the jury is deadlocked on the greater offense. *Id.*

The difference between the State's closing argument and MAI–CR3d 314.04 is minimal. Regardless, this Court assumes that the jury followed the instruction of the court, *see State v. Bowman,* 741 S.W.2d 10, 15 (Mo. banc 1987), which was a proper instruction mirroring MAI–CR3d 314.14. "Additionally . . . the strength of the evidence of deliberation precludes a

---

8. We do not reach whether the term "conscious decision" was error at all.

finding of prejudice." *Tisius,* 183 S.W.3d at 217.[9]

### 3. Unanimity for Elements of First–Degree Murder

Appellant argues the first-degree murder jury instruction did not require unanimity for each element of first-degree murder.

The first-degree murder instruction provided, "unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree." MAI–CR3d 314.02. The jury was also instructed:

> You will then discuss the case with your fellow jurors. Each of you *must decide the case for yourself* but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.
>
> Your verdict, whether guilty or not guilty, *must be agreed to by each juror.* Although the *verdict must be unanimous,* the verdict should be signed by your foreperson alone.
>
> When you have concluded your deliberations, you will complete the applicable form to which you *unanimously agree* and return it with all the unused forms and the written instructions of the Court.

MAI–CR3d 302.05 (emphasis added).

The instructions require unanimity as to each element. *See State v. Johnston,* 957 S.W.2d 734, 752 (Mo. banc 1997) (finding no constitutional error when the trial court refused to further explain the jury instruc-

tions when the jury asked if each element had to be unanimously agreed to). The instruction is not erroneous.

### D. Conclusion

For the third point, the trial court did not err. The point is denied.

## VII. Point Four: Lesser–Included Offense Instructions

■■■ In the fourth point, Appellant argues the trial court erred in refusing to give jury instructions for second-degree murder without sudden passion and voluntary manslaughter.

■■■ A defendant is entitled to a jury instruction when the evidence, "viewed in light most favorable to the defendant," establishes a theory or supports contrary results. *State v. Avery,* 120 S.W.3d 196, 200 (Mo. banc 2003). A jury instruction for a lesser-included offense is required when the evidence "provides a basis both for the acquittal of the greater offense and the conviction of the lesser offense." *Id.* at 205.

■■ The failure to give a different lesser-included offense instruction is neither erroneous nor prejudicial when instructions for the greater offense and *one* lesser-included offense are given and the defendant is found guilty of the greater offense. *State v. Glass,* 136 S.W.3d 496, 515 (Mo. banc 2004); *Johnston,* 957 S.W.2d at 751–52.

Appellant requested instructions for second-degree murder without sudden passion [10] and voluntary manslaughter.[11] The trial court refused Appellant's request and

---

9. See pages 11–12 for a discussion of evidence applicable to this point.

10. Appellant's proposed jury instruction for second-degree murder without sudden passion:

> If you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree under this instruction.
> If you find and believe from the evidence beyond a reasonable doubt:

submitted instructions for first-degree murder[12] and second-degree murder.[13] The failure to give instructions for the different lesser-included offenses was not erroneous or prejudicial as the jury was instructed as to a lesser-included offense and found Appellant guilty of the greater offense. The trial court did not err and the point is denied.

## VIII. Point Five: Improper Sentence

In the fifth point, Appellant makes the following arguments: A) "the trial court erred in sentencing [Appellant] to death violating due process, fundamental fairness, and reliable, proportionate sentencing;" B) "[n]umerous trial errors, strong mitigating evidence, and a previous jury not finding [Appellant] guilty of first degree murder show this is an inappropriate case for death;" and C) "Missouri's lack of standards afford prosecutors unguided discretion in seeking death sentences resulting in inconsistent application of the death penalty. To safeguard against the arbitrariness of unguided prosecutorial discre-

> First, that on or about July 5, 2005, in the County of St. Louis, State of Missouri, the defendant caused the death of Sgt. William McEntee by shooting him, and
> Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Sgt. William McEntee, and
> Third, that defendant did not do so under the influence of sudden passion arising from adequate cause,
> then you will find the defendant guilty of murder in the second degree.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree. As used in this instruction, the term "sudden passion" means passion directly caused by and arising out of provocation by St. William McEntee or another acting with Sgt. William McEntee which passion arose at the time of the offense. The term "adequate cause" means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.
> MAI–CR3d 314.04.

11. Appellant's proposed jury instruction for voluntary manslaughter:
> If you do not find defendant guilty of murder in the second degree, you must consider whether he is guilty of voluntary manslaughter.
> If you find and believe from the evidence beyond a reasonable doubt:
> First, that on or about July 5, 2005, in the County of St. Louis, State of Missouri, the defendant caused the death of Sgt. William McEntee by shooting him, and
> Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Sgt. William McEntee, then you will find the defendant guilty of voluntary manslaughter.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of voluntary manslaughter.
> MAI–CR3d 314.08.

12. See footnote 6 for the submitted first-degree murder instruction, MAI–CR3d 314.02.

13. The submitted jury instruction for second-degree murder:
> If you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree under this instruction.
> If you find and believe from the evidence beyond a reasonable doubt:
> First, that on or about July 5, 2005, in the County of St. Louis, State of Missouri, the defendant caused the death of Sgt. William McEntee by shooting him, and
> Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Sgt. William McEntee, then you will find the defendant guilty of murder in the second degree.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.
> MAI–CR3d 314.04.

tion, when the state seeks death, it should be required to afford the accused an opportunity to avoid a death sentence by pleading guilty to first degree murder or a lesser offense."

### A. Proportionality Review

This Court is statutorily required to engage in a proportionality review and determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Section 565.035.3.

#### 1. Passion, Prejudice and Arbitrary Factors

Appellant does not allege, and a review of the record does not indicate, the death sentence was influenced by passion, prejudice, or arbitrary factors.

#### 2. Aggravating Factors

■■■ The evidence supports beyond a reasonable doubt the jury's findings of three aggravating factors. Appellant "knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person" when he shot Sgt. McEntee multiple times and a bullet struck a juvenile standing next to the patrol car. The act involved depravity of mind and the murder was "outrageously and wantonly vile, horrible, and inhuman,"

as the act involved two distinctly separate shootings within a short period of time and Sgt. McEntee was seriously injured and helpless at the time of the second shooting. The act was "committed against a peace officer while engaged in the performance of his official duty" as Sgt. McEntee was responding to a call and was in his patrol car.

#### 3. Similar Cases

■■■ The death sentence is neither excessive nor disproportion in this case. This Court has upheld death sentences when a police officer was killed. *See State v. Tisius,* 92 S.W.3d 751, 765–66 (Mo. banc 2002) *(Tisius I ); State v. Clayton,* 995 S.W.2d 468, 484 (Mo. banc 1999); *State v. Johnson,* 968 S.W.2d 123, 135 (Mo. banc 1998). This Court has also upheld death sentences where an injured and helpless victim is subject to a fatal blow. *See Tisius I,* 92 S.W.3d at 765–66; *State v. Cole,* 71 S.W.3d 163, 177 (Mo. banc 2002); *Johns,* 34 S.W.3d at 118; *State v. Middleton,* 995 S.W.2d 443, 467 (Mo. banc 1999).

### B. Trial Errors, Mitigating Evidence

Appellant alleges that "[n]umerous trial errors, strong mitigating evidence, and a previous jury not finding [Appellant] guilty of first degree murder show this is an inappropriate case for death." This Court found no trial errors when reviewing the record; thus, the alleged errors did not make the sentence unreliable. *See Johnson I,* 207 S.W.3d at 50.

■■■ During the punishment phase, Appellant presented mitigating evidence of childhood abuse and neglect and good character. Deference is given to the jury's decision when "there was sufficient evidence from which a reasonable juror could have found that the mitigating evidence did not outweigh the aggravating evi-

dence." *State v. Johnson,* 244 S.W.3d 144, 157–58 (Mo. banc 2008). On reviewing the evidence, a reasonable juror could properly find the mitigating evidence of Appellant's childhood and good character did not outweigh the aggravating factors. This Court has upheld the death penalty despite evidence of childhood neglect. *See id.* at *157; State v. Brooks,* 960 S.W.2d 479, 503 (Mo. banc 1997).

Appellant also alleges the strength of the evidence is insufficient to support the sentence because his first trial ended when the jury could not reach a verdict. A prior mistrial is not dispositive on imposing the death sentence. *See State v. Barton,* 240 S.W.3d 693 (Mo. banc 2007) (death penalty upheld after two prior mistrials and a conviction reversed).

### C. Prosecutorial Discretion

Appellant argues his death sentence should be set aside due to prosecutorial discretion in seeking the death penalty. This Court has rejected this argument. *State v. Barnett,* 980 S.W.2d 297, 309 (Mo. banc 1998).

### D. Conclusion

Point five is denied.

### IX. Point Six: Strike for Cause

■ In the sixth point, Appellant argues the trial court erred in striking Juror Tompkins for cause. The State struck juror Tompkins for cause due to her position on the death penalty. During voir dire the following exchange occurred:

MR. McCULLOCH [State]: Ms. Tompkins, let me ask you the questions. Do you think the death penalty is the appropriate punishment in some cases?

VENIREPERSON TOMPKINS: *I really could not see any case where it would be appropriate. I do feel I am somewhat impartial. I can be con-*

*vinced otherwise, but I really do not see any case where the death penalty is appropriate.*

MR. McCULLOCH: And other than what you may have read or heard about this case and setting that aside, you haven't heard any of the facts, you haven't heard any evidence in this case, correct?

VENIREPERSON TOMPKINS: Right, I mean, I don't even think with Jeffrey Dahmer, you know, things like that. You know, I'm—

MR. McCULLOCH: From what you know through the media about the facts in that case—let me ask you the question directly. *I'm not going to ask you what they are, but can you imagine a set of circumstances where you would think death is the appropriate punishment?*

VENIREPERSON TOMPKINS: *I've been sitting here as you asked and I'm trying to think, and I mean, maybe genocide or something like that.*

MR. McCULLOCH: Involving mass murder?

VENIREPERSON TOMPKINS: Yeah.

MR. McCULLOCH: Okay. Let me ask you, in this case you have heard a couple of times already, if the jury finds Kevin Johnson guilty of Murder in the First Degree, we go into that second phase, the jury makes the decision that at least one aggravating circumstance exists beyond a reasonable doubt, and then the jury weighs the mitigating evidence against the aggravating evidence. If you as a juror on a jury decide that the evidence in aggravation outweighs the evidence in mitigation, would you automatically at that point—the only decision left is which punishment is appropriate, which one do we impose. *Would*

*you exclude the death penalty as a possible punishment?*

VENIREPERSON TOMPKINS: *Unless something, you know, tremendously—you know, something within the evidence that is given can convince me otherwise, I really don't think that—I think there would be only one option unless something real extraordinary happened that I saw.*

MR. McCULLOCH: As you have been sitting here for the last half hour or so, you haven't been able to think of something that would be that extraordinary, have you?

VENIREPERSON TOMPKINS: No.

MR. McCULLOCH: Okay. And believe me, I don't want to put words in your mouth, but it sounds like other than in the case of mass murder—genocide. Not even mass murder. Genocide, you don't think death would be a possibility for you?

VENIREPERSON TOMPKINS: I mean, not that I can think of unless something is presented that I never thought about, you know, somewhat possible.

. . . .

MS. KRAFT [Defense]: Okay. Thank you. Ms. Tompkins, with regard to the issue on the death penalty versus life without parole, is it possible that you could hear some evidence as you sat in this courtroom that would convince you that the death penalty was the appropriate punishment?

VENIREPERSON TOMPKINS: Anything is possible.

MS. KRAFT: Okay. So you haven't ruled out the possibility in your own mind that that could happen?

VENIREPERSON TOMPKINS: No. I mean, even when she spoke of, you know, someone being psychopathic, I

thought I would—in that situation, if I was would told to consider it, I might be open. *Most of me says it's not a possibility, but I'm open.*

MS. KRAFT: *Okay. So you're not entirely closed off to the idea that you could hear something that would make you think that death would be an appropriate punishment?*

VENIREPERSON TOMPKINS: *Right.*

MS. KRAFT: *Even in this case?*

VENIREPERSON TOMPKINS: Uh-huh.

MS. KRAFT: Is that yes?

VENIREPERSON TOMPKINS: *Yeah.*

MS. KRAFT: Okay. And you wouldn't automatically reject any kind of mitigating evidence that you might hear, evidence presented on Kevin's behalf, his background, upbringing, that kind of thing?

VENIREPERSON TOMPKINS: I wouldn't reject any evidence.

MS. KRAFT: Okay. You wouldn't reject any that the State presented either?

VENIREPERSON TOMPKINS: No. (Emphasis added).

The following exchange occurred when the State struck Tompkins:

MR. McCULLOCH [State]: I move to strike for cause Juror No. 32, Ms. Tompkins. Ms. Tompkins made it initially very clear she didn't think death was ever appropriate. She modified it somewhat to genocide cases, perhaps to something a little more nebulous, a psychopath would be better off executed. It's real clear she will reject that automatically as a—death automatically as a possible punishment in the case.

THE COURT: Response?

MS. KRAFT [Defense]: Yes, because Ms. Tompkins did say it was possible

that something could be presented in this courtroom that would convince her that death would be an appropriate punishment in this case.

THE COURT: Any objection?

MR. McCULLOCH: I think like the previous panel, Judge, a credibility issue there. Yes, this is a different situation, but she said, yeah, I got an opinion, but I can. I think credibility is the appropriate word, but certainly she talked about maybe genocide, a psychopath is better off executed. It think it's very clear that she is not going to consider death as a possible punishment in this case, noting for the record there will be no evidence of genocide.

THE COURT: *Based upon the answer that she gave and the Court's view of her body language and assessing her credibility, she could not consider the death penalty.* The motion to strike for cause will be sustained.

(Emphasis added).

Appellant raised this issue in the motion for new trial.

 A strike for cause is reviewed for abuse of discretion. *Tisius I*, 92 S.W.3d at 763. The standard to remove a juror for cause because of his or her position on the death penalty is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

 While a juror's qualification is determined from the entire voir dire and not from a single response, the trial court may give more weight to a single response when presented with "conflicting testimony regarding a prospective juror's ability to consider the death penalty." *Id.* In

determining a juror's qualifications, the trial court is granted broad discretion given its position to observe the juror. *State v. Ringo*, 30 S.W.3d 811, 816 (Mo. banc 2000).

This case is similar to *Tisius I*, where this Court found no abuse of discretion in striking a juror for cause when the juror unequivocally opposed the death penalty and later supported it only for terrible crimes. 92 S.W.3d at 762–63. The trial court acted within its discretion. The point is denied.

## X. Point Seven: *Miranda* Rights

In the seventh point, Appellant argues the trial court plainly erred in admitting Appellant's interview with the police into evidence because he did not waive his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### A.

Appellant surrendered three days after Sgt. McEntee was killed. Appellant was given his *Miranda* rights when taken into custody and again before he was interviewed. Appellant gave a response to the *Miranda* rights before the interview was taped, but it was inaudible and a written waiver was not signed. The transcript of the interview shows the conversation, in context, as:

DETECTIVE [N]ESKE [14]: Okay. We're going to talk about some things, all right? Before you make any answers, say anything, I want you to listen to what I have to say, all right? I'm going to read you your rights, okay? Just advise you of all that stuff. I'm going to talk to you for a minute before

---

**14.** The transcript of the interview mistakenly names Det. Neske as Det. Meske.

you make any decisions, okay? Can you do that for me?

KEVIN JOHNSON: Yeah.

DETECTIVE [N]ESKE: All right. I want you to speak loud and clear, okay? I have trouble hearing sometimes, all right?

KEVIN JOHNSON: Yeah.

DETECTIVE [N]ESKE: You know you have the right to remain silent. You know anything you say can be used against you in a court of law. You're entitled to talk to an attorney, have an attorney present. If you can not afford an attorney, one will be appointed to you. *Do you understand all of that?*

KEVIN JOHNSON: (inaudible).

DETECTIVE [N]ESKE: *Okay. We all know why we're here?*

KEVIN JOHNSON: Yeah.

(Emphasis added).

At trial, Det. Neske testified that he read Appellant his *Miranda* rights and that Appellant wanted to speak with police. Det. Neske's testimony was:

Q [State]: And we heard testimony earlier that when he was taken into custody he had been advised of his rights. Was he advised of his rights again?

A [Det. Neske]: Yes, I was told by Detective Bradley that his rights were read upon him being placed in his custody. And when Detective—or Officer Bales and I entered the interview room, I orally advised him of his rights.

Q *Did he understand those rights, indicated that he understood them?*

A *Yes, he did.*

Q Including the right to remain silent?

A Yes.

Q *Did he agree to waive the rights and speak with you?*

A *Yes, he wanted to talk to me.*

Q Without a lawyer, or did he ask for an attorney or anything along those lines?

A Never asked for an attorney.

Q *Wanted to talk to you about this occurrence?*

A *Yes.*

(Emphasis added).

After Appellant was advised of his rights, the interview commenced and lasted for more than five hours. At three points in the interview, Appellant stated "I don't want to talk to you now. You want—," "I don't want to answer no more questions," and "I don't want to answer your questions." After making these statements, Appellant continued to engage in the conversation, either answering the questions directly or stating he did not know. He never asked for an attorney.

Appellant did not file a motion to suppress his statements, as shown by the record:

MR. MONAHAN [State]: There are no motions to suppress on file. I was anticipating they might file some I had discussions with Ms. Kraft that apparently there will be none that will be filed. That's a matter of trial strategy for her. I just wanted to get that out in the open that that's what's going on.

THE COURT: *Do you anticipate filing any motions to suppress?*

MS. KRAFT [Defense]: *Not unless something comes up somehow in these jail phone calls that we have received.*

THE COURT: That's either evidence seized or statements or identification?

MS. KRAFT: That's correct.

THE COURT: Okay. Thank you.

(Emphasis added).

Appellant also did not object when the recording of the statement was offered into evidence, as shown by the transcript:

Q [Mr. McCulloch, State] Let me show you what we've marked as State's Exhibit 70. Do you recognize this?

A [Det. Neske] Yes, that's the DVD that I download from the interview.

. . . .

MR. McCULLOCH [State]: Judge, at this time, I would offer State's Exhibit 70 into evidence.

THE COURT: Any objection?

MS. KRAFT [Defense]: No.

THE COURT: Exhibit 70 will be admitted.

### B.

#### 1. ˙ *Miranda Rights*

 *Miranda* rights inform a criminal defendant of his constitutional rights during the interrogation process. *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997). The state must prove a challenged statement complied with the guidelines established in *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and was voluntary. *State v. Groves*, 646 S.W.2d 82, 84 (Mo. banc 1983). A defendant may waive his *Miranda* rights by "orally indicating his willingness to cooperate with the police questioning" despite refusing to sign a written waiver. *Id.* at 85. In *Groves*, this Court found, on plain error review, the defendant was fully aware of his *Miranda* rights without a written waiver when a police officer testified the defendant did not object to the interview and freely talked with police. *Id.* at 83–85. From the record, it is evident that Appellant indicated his willingness to talk with police by orally agreeing to talk and engaging in a five-hour interview, despite not signing a waiver.

 *Miranda* rights may be invoked at any time by giving "a clear, consistent expression of a desire to remain silent." *Simmons*, 944 S.W.2d at 173–74. Appel-

lant did not invoke his *Miranda* rights at any point. Appellant's statements did not convey a clear desire to remain silent and he continued to talk after making each statement. Appellant's constitutional rights were not violated.

#### 2. *Waiver of Appellate Review*

 Additionally, Appellant's strategic decision not to object to the admission of the statement constituted a waiver. An objection to the admission of evidence must be made to preserve the issue for appeal. *Johnson v. State*, 189 S.W.3d 640, 646 (Mo.App.2006). Plain error review would apply when no objection is made due to "inadvertence or negligence." *State v. Mead*, 105 S.W.3d 552, 556 (Mo.App. 2003). Plain error review is waived when "counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence." *Id.* Plain error review does not apply when "a party affirmatively states that it has no objection to evidence an opposing party is attempting to introduce" or for a trial strategy reason. *Id.* at 556. Appellant affirmatively stated "no objection" to the admission of the interview, thereby waiving plain error review of his constitutional rights.

#### 3. *Substantial Right*

Appellant's argument that his constitutional right to remain silent was violated and that the interview is inadmissible was not objected to or preserved. This Court has discretion to review a point regarding a substantial right not preserved. Rule 30.20. This Court finds no plain error as Appellant failed to show a manifest injustice resulted from the actual interview or admission of the interview into evidence.

### C.

The trial court did not plainly err. The point seven is denied.

## XI. Point Eight: Aggravating Circumstances

In the eighth point, Appellant argues the trial court erred in: A) overruling Appellant's objection to admitting and reading a victim impact statement from Sgt. McEntee's son as it was hearsay and invited the sentence to be based on passion and emotion; and B) submitting the aggravating circumstances jury instruction, MAI–CR3d 314.40, and refusing to submit Appellant's modified aggravating circumstances instruction as the jury was not instructed how to consider non-statutory aggravating factors.

### A. Victim Impact Statement

Appellant argues the trial court erred in overruling Appellant's objection to admitting and reading a victim impact statement from Sgt. McEntee's son as it was hearsay and invited the sentence to be based on passion and emotion. Appellant also raised constitutional arguments related to aggravators and the Confrontation Clause.

Sgt. McEntee's wife read a letter their then nine-year-old son wrote to his father. The son was twelve years old at the time of the trial and did not testify in the guilt or penalty phases. Appellant objected to the letter's admission as hearsay, and the State defended the exhibit as a victim impact statement from a twelve-year-old. The trial court judge overruled the objection and admitted the letter. On cross examination, Appellant did not ask Mrs. McEntee any questions about the letter.

The son's letter is as follows:

Day one. The next day. I was all shook up about what happened. I did not go outside until five o'clock.

Day two. Coming out. I was still sad but I came out and went to my friend's house, Michael. I had a good time, but I miss him.

Day three. Lay out. It was hard to get past. I was about to burst, but I didn't. I sat in a room for seven hours wondering why I still didn't know, nobody does know except the guy who did it.

Day four. Funeral. It was sad day for me and everyone else. Then it was the end. Everyone said their goodbyes, and they left. Then I wondered why.

Those are the four most saddest days of my life. I am still sad today, and I wonder why. It has been three to four months from then, and we are doing better.

I am sad because he was the best coach ever and no one who could take my dad's spot, nobody. He was also my baseball coach, and I am sad about him not being there when I need him and I am lonely, when I kick a soccer ball. He was the greatest dad ever. He was ready for soccer season, and someone took his life away. I was so mad. I was in shock that night. I thought he would be okay, but I was wrong. He had passed away.

Dad, if you hear me right now, I love you.

The trial court has discretion to admit evidence deemed helpful to the jury in the penalty phase. *State v. Clark*, 197 S.W.3d 598, 600 (Mo. banc 2006). A victim impact statement is admissible to show the victim was a unique individual. *Forrest*, 183 S.W.3d at 225. Evidence of the specific harm a defendant caused may be presented in the sentencing phase for the jury to "assess meaningfully the defendant's moral culpability and blameworthiness." *State v. Basile*, 942 S.W.2d 342, 359 (Mo. banc 1997). A victim impact statement violates the federal and state constitutions only when it "is so unduly prejudicial that it renders the trial funda-

mentally unfair." *Forrest*, 183 S.W.3d at 225.

■■■■ "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and depends on the veracity of the statement for its value." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). The victim impact statement offered during the sentencing phase was offered to show the effect of the crime on the victim's son and his feelings, not for the truth of any factual matter asserted therein.

In *Basile*, this Court found the trial court properly overruled a motion to exclude a family member's victim impact statement read by another family member. 942 S.W.2d at 358–59. The letter described the victim and the effect the crime had on the family. *Id.* at 358. This Court found the letter admissible because it "was directed at [the] defendant's moral culpability in causing harm to the victim and her family." *Id.* at 359. Sgt. McEntee's son's letter is similar to the letter in *Basile* as the son described how he felt and the impact his father's death had on his life.

A victim impact statement is not offered to prove an element of the charged offense or a statutory aggravating circumstance. As this Court said in *Basile:*

> Under our statutes, there is no requirement that the victim impact statement evidence be related to the specific aggravators submitted by the State. It is sufficient that it is relevant to inform the jury as to the effect of the crime for which the defendant is being sentenced

even if no instruction is given regarding the evidence.

942 S.W.2d at 359. Here, the son's letter was not used to support any of the three statutory aggravating circumstances and was only used to show the effect of the crime on the son. The letter was properly used as a victim impact statement because it addressed the effect of the crime.

■■■■ A victim impact statement is not subject to the Confrontation Clause. "The Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority's selection decisions." *United States v. Fields*, 483 F.3d 313, 326 (5th Cir.2007). In *Fields*, the challenged hearsay statements related to non-statutory aggravating factors and were not barred by the Confrontation Clause because the factors were not used to determine if the defendant was eligible for the death penalty. *Id.* at 325. *See also United States v. Wallace*, 408 F.3d 1046, 1048 (8th Cir.2005).

### B. Aggravating Circumstances Jury Instructions

Appellant argues the trial court erred in submitting the aggravating circumstances jury instruction, MAI–CR3d 314.40, and refusing to submit Appellant's modified aggravating circumstances instruction, because the jury was not instructed how to consider the non-statutory aggravating factors.

The State submitted the MAI jury instruction for aggravating circumstances,[15] which the trial court accepted. Appellant

---

15. The submitted jury instruction for statutory aggravating circumstances:

> In determining the punishment to be assessed against the defendant for the murder of Sgt. William McEntee, you must first consider whether one or more of the following statutory aggravating circumstances exists:

> 1. Whether the defendant by his act of murdering Sgt. William McEntee knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person.
> 2. Whether the murder of Sgt. William McEntee involved depravity of mind and

submitted a modified aggravating circumstances instruction,[16] which instructed the jury to consider the non-statutory aggravating circumstances only if they are found beyond a reasonable doubt. During the instruction conference, Appellant objected to the State's proposed instruction because it does not address the burden of proof for non-statutory circumstances. The trial court refused to submit the modified instruction. Appellant relies on *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003); and *State v. Whitfield*, 837 S.W.2d 503 (Mo. banc 1992).

■ Under section 565.030.4, the jury is required to find a statutory aggravating circumstance beyond a reasonable doubt. *State v. Gill*, 167 S.W.3d 184, 193 (Mo. banc 2005); section 565.030.4(2). The reasonable doubt standard does not apply to mitigating evidence, *Gill*, 167 S.W.3d at

193, or non-statutory aggravating factors, including victim impact statements, *see Forrest*, 183 S.W.3d at 226. Appellant's reliance on *Ring*, *Apprendi*, and *Whitfield* is misplaced. This Court has stated that under *Ring* and *Apprendi* only evidence functionally equivalent to an element, including statutory aggravating circumstances, must be found beyond a reasonable doubt. *Clark*, 197 S.W.3d at 601. The trial court was not obligated to instruct the jury to find non-statutory aggravators, including a victim impact statement, beyond a reasonable doubt.

## C. Conclusion

The trial court did not err. Point eight is denied.

## XII. Point Nine: Depravity of Mind

■ In the ninth point, Appellant argues the trial court erred in overruling the objection to the statutory aggravating circumstances instruction because the de-

whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant committed repeated and excessive acts of physical abuse upon Sgt. William McEntee and the killing was therefore unreasonably brutal.
3. Whether the murder of Sgt. William McEntee was committed against a peace officer while engaged in the performance of his official duty.
You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance. Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing statutory aggravating circumstances exist, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

MAI–CR3d 314.40.

16. Appellant's proposed modified jury instruction for non-statutory aggravating circumstances, based on MAI–CR3d 314.40:

*If you have, unanimously and beyond a reasonable doubt, found that one or more of the statutory aggravating circumstances submitted in Instruction No. ___ exists, you must next consider whether any other aggravating evidence exists. In deciding whether any other aggravating evidence exists, you may consider all of the evidence presented in both the guilt and the punishment stages of trial. You are further instructed that the burden rests upon the state to prove, beyond a reasonable doubt, evidence of non-statutory aggravating circumstances. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance. You must list at the bottom of this instruction each non-statutory aggravating circumstance, if any, that you have unanimously found to exist beyond a reasonable doubt.*
(Modifications in italics).

pravity of mind factor is unconstitutionally vague.

The statutory aggravating circumstances instruction included the "depravity of mind" factor. The relevant portion of the instruction, based on MAI–CR3d 314.40:

> In determining the punishment to be assessed against the defendant for the murder of Sgt. William McEntee, you must first consider whether one or more of the following statutory aggravating circumstances exists:
>
> . . . .
>
> 2. Whether the murder of Sgt. William McEntee involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the *defendant committed repeated and excessive acts of physical abuse upon Sgt. William McEntee and the killing was therefore unreasonably brutal.*

(Emphasis added).

Appellant's objection to the factor as unconstitutionally vague was overruled.

During deliberations, the jury asked for the definition of "depravity of mind" to which the trial court directed the jury to the instructions provided. The jury then requested a dictionary, which was denied.

The jury found beyond a reasonable doubt that the murder of Sgt. McEntee involved depravity of mind.[17] Appellant renewed his objection to the instruction as unconstitutionally vague in the motion for new trial.

This Court has previously found the instruction is not unconstitutionally vague as sufficient guidance is provided. *Johnson I,* 207 S.W.3d at 46. The "depravity of mind" factor requires evidence to support at least one factor established in *State v. Preston,* 673 S.W.2d 1, 11 (Mo. banc 1984). *State v. Griffin,* 756 S.W.2d 475, 490 (Mo. banc 1988); *see also* MAI–CR–3d 314.40, Notes on Use 8(D). The *Preston* factors are:

> mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

673 S.W.2d at 11. The notes to MAI–CR3d 314.40 provide ten phrases that may be used, depending upon the facts of a case, to comply with the *Preston* factors.[18] MAI–CR–3d 314.40, Notes on Use 8(B), (D). In this case, the instruction used the phrase "that the defendant committed repeated and excessive acts of physical abuse

---

17. The jury also found beyond a reasonable doubt the two other aggravating circumstances, great risk of death by a hazardous weapon and the act was committed against a peace officer.

18. The ten phrases that may be used to find depravity of mind are:
 ■ That the defendant inflicted physical pain or emotional suffering on [name of victim] and that defendant did so for the purpose of making [name of victim] suffer before dying.
 ■ That the defendant committed repeated and excessive acts of physical abuse

upon [name of victim] and the killing was therefore unreasonably brutal.
■ That the defendant killed [name of victim] after he was bound or otherwise rendered helpless by (defendant) (or) ([name or describe person acting with defendant]) and that defendant thereby exhibited a callous disregard for the sanctity of all human life.
■ That the defendant killed [name of victim] knowing that [name of victim] was physically disabled and helpless and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

upon Sgt. William McEntee and the killing was therefore unreasonably brutal," which the jury found beyond a reasonable doubt. The instruction was not vague as the specific language defines "depravity of mind."

There was no error in submitting the instruction, and Appellant was not prejudiced. The point is denied.

## XIII. Point Ten: Mitigating Circumstance Instruction

In the tenth point, Appellant argues the trial court erred in overruling Appellant's objection to the mitigating circumstances instruction and refusing Appellant's modified instruction. Appellant argues the state, not the defendant, has the burden to prove the mitigating factors outweigh the aggravating factors.

In the penalty phase instruction conference, the mitigating circumstances instruction [19] was offered over Appellant's modi-

> ■ That the defendant, while killing [name of victim] or immediately thereafter, purposely mutilated or grossly disfigured the body of [name of victim] by (an act) (acts) beyond that necessary to cause his death.
> ■ That the defendant, while killing [name of victim] or immediately thereafter, (had sexual intercourse with her) (sexually violated her (by inserting a [Describe object.] into the (anus) (vagina) of [name of victim]) (by inserting his penis into the (mouth) (anus) of [name of victim])).
> ■ That the defendant killed [name of victim] as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of all human life.
> ■ That the defendant's selection of the person he killed was random and without regard to the victim's identity and that defendant's killing of [name of victim] thereby exhibited a callous disregard for the sanctity of all human life.
> ■ That the defendant killed [name of victim] for the purpose of causing suffering to another person and thereby exhibited a callous disregard for the sanctity of all human life.
> ■ That the defendant killed [name of victim] for the sole purpose of deriving pleasure from the act of killing and thereby exhibited a callous disregard for the sanctity of all human life.
>
> MAI–CR3d 314.40, Notes on Use 8(B) (brackets and parentheses in original).

19. The submitted jury instruction for evidence in aggravation and mitigation:
> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 12 [statutory aggravating instruction] exists, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment.
> In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial, including evidence presented in support of the statutory aggravating circumstances submitted in Instruction No. 12, and evidence presented in support of mitigating circumstances submitted in this instruction. As circumstances that may be in mitigation of punishment, you shall consider:
> 1. Whether the defendant has no significant history of prior criminal activity.
> 2. Whether the murder of Sgt. William McEntee was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> 3. The age of the defendant at the time of the offense.
> You shall also consider any other facts or circumstances which you find from the evidence in mitigation of punishment.
> It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the facts or circumstances in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

fied instruction[20] and objections. The three objections Appellant raised were: (1) the instruction did not contain a burden of proof that the aggravating factors must outweigh the mitigating factors; (2) the burden of proof is shifted to the Appellant to prove the mitigating factors outweigh the aggravating factors; and (3) the jury was not informed that when the aggravating and mitigating factors are given equal weight, life without parole is the proper verdict. The trial court accepted the instruction as submitted by the State.[21] Ap-

pellant preserved this point in the motion for new trial.

Appellant's argument that the instruction improperly shifts the burden of proof has been rejected by the United States Supreme Court and this Court. The United States Supreme Court stated:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional

---

MAI–CR3d 314.44.

**20.** Appellant's proposed modified jury instruction for evidence in aggravation and mitigation, based on MAI–CR3d 314.44:

As to Count I, if you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. ___ exists, you must then determine whether there are facts or circumstances in mitigation of punishment *and, if so, whether the aggravating circumstances that you, unanimously and beyond a reasonable doubt have found to exist, outweigh the mitigating circumstances.*

*The state bears the burden of proving beyond a reasonable doubt that the aggravating circumstances that you have unanimously found outweigh the mitigating circumstances.*

In deciding whether there are facts and circumstances in mitigation of punishment, you may consider all of the evidence presented in both the guilt and the punishment stages of trial.

*However, the only aggravating evidence that you may consider in determining whether the aggravating evidence outweighs the mitigating evidence is that aggravating evidence that you have unanimously and beyond a reasonable doubt found to exist.*

As circumstances that may be in mitigation of punishment, you shall consider:
1. Whether the defendant has no significant history of prior criminal activity.
2. Whether the murder of William McEntee was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. The age of the defendant at the time of the offense

You shall also consider *all* other facts or circumstances which you find from the evidence in mitigation of punishment. It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. In weighing the aggravating and mitigating evidence, each juror must decide, individually, what mitigating evidence exists. *However, the only aggravating evidence that may be weighed against the mitigating evidence is the aggravating evidence that all jurors unanimously find to exist beyond a reasonable doubt. If all the jurors do not agree that the state has proved beyond a reasonable doubt that the evidence in aggravation of punishment outweighs the evidence in mitigation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.*

(Modifications are in italics).

**21.** The approved instruction was typed by the State but would have been submitted by Appellant. After Appellant objected to the instruction and offered a modified version, Appellant said it "would be more appropriate for the State to submit it since I made some objections to it." The State responded, "I don't think I should be in the business of submitting mitigating evidence, but—" when the trial court judge marked the State as submitting the instruction.

rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Kansas v. Marsh*, 548 U.S. 163, 170–71, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (quoting *Walton v. Arizona*, 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (*overruled on* other grounds by *Ring*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556)).

This Court has also rejected the argument in *State v. Taylor*, 134 S.W.3d 21, 30 (Mo. banc 2004).

The trial court did not err. The point is denied.

## XIV. Point Eleven: Indictment

In the eleventh point, Appellant argues the trial court erred in overruling the motion to quash the information or preclude the death penalty because the State did not plead the statutory aggravators in the indictment.

Appellant was indicted for first-degree murder, first-degree robbery, first-degree assault, and three counts of armed criminal action. The State later filed notice of aggravation pursuant to section 565.005.1(1). Appellant raised this argument in a pre-trial motion and in the motion for new trial.

Appellant relies on *Ring*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, for the proposition that statutory aggravators must be included in the charging document because it is the "functional equivalent of an element of a greater offense." This Court has repeatedly rejected the argument because "Missouri's statutory scheme recognizes a single offense of murder with a maximum sentence of death, and the required presence of

aggravating facts or circumstances to result in this sentence in no way increases this maximum penalty." *Johnson I*, 207 S.W.3d at 48. *See also, e.g., Gill*, 167 S.W.3d at 193–94; *Glass*, 136 S.W.3d at 513, *State v. Gilbert*, 103 S.W.3d 743, 747 (Mo. banc 2003). Notice of statutory aggravators, as required by section 565.005.1, "stands in lieu of charging them in the information or indictment." *Johnson I*, 207 S.W.3d at 48.

The State was not required to include the statutory aggravators in the indictment and filed the necessary notice. The trial court did not err. The point is denied.

## XV. Conclusion

The trial court's judgment is affirmed.

STITH, C.J., RUSSELL, WOLFF, BRECKENRIDGE and FISCHER, JJ., concur; TEITELMAN, J., concurs in part and dissents in part in separate opinion filed.

RICHARD B. TEITELMAN, Judge, concurring in part and dissenting in part.

I respectfully dissent from the principal opinion to the extent that it finds no *Batson*[1] violation with respect to the state's peremptory strike of Ms. Cottman.

In response to appellant's *Batson* challenge, the state offered two justifications for striking Ms. Cottman: her past association with the Annie Malone Children's Home and her alleged unwillingness to answer questions regarding whether she could impose the death penalty. A review of the record demonstrates that neither justification is race-neutral.

As a child, appellant was under the legal custody of the Division of Family Services.

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The division placed appellant in several children's homes, including Father Dunne's, St. Joseph's Home for Children and the Annie Malone Children's Home. The state justified its strike of Ms. Cottman, in part, because she had served as a foster parent for children placed with the Annie Malone Children's Home. The state's justification has a factual, race-neutral relationship to this case because both Ms. Cottman and appellant share an association with the Annie Malone Children's Home. There are, however, two critical flaws in the state's justification.

First, the logical relevance of appellant's and Ms. Cottman's association with Annie Malone Children's Home applies with equal force to any other juror who was associated with an agency or organization that provided services to appellant. There were at least four white jurors who had substantial contacts with the division, which had legal custody of appellant for most of his childhood. None of these jurors was stricken. The failure to strike similarly situated white jurors severely undermines the race-neutrality of the state's strike. *Miller–El v. Dretke*, 545 U.S. 231, 247, 125 S.Ct. 2317, 162 L.Ed.2d 196(2005).

A second and related flaw is that the state did not ask any other jurors, including some who had experience with the division and the foster care system, if they were familiar with the Annie Malone organization or any of the several other private organizations that had offered services to appellant during his childhood. If the state's concerns regarding Ms. Cottman's service were truly race-neutral, then it follows that the prosecutor would have asked the remaining jurors if they, like Ms. Cottman, had any past association with any of these organizations. The state's failure to ask this simple question of similarly situated white jurors indicates the state's concern regarding Ms. Cott-

man's association with Annie Malone Children's Home was not race-neutral and was, instead, an impermissible pretextual "makeweight" justification for striking Ms. Cottman. *See Miller–El*, 545 U.S. at 246, 125 S.Ct. 2317.

The state also justified its strike of Ms. Cottman by arguing that she exhibited an "unwillingness" to answer questions during the death-qualification voir dire. The state asked nearly all the prospective jurors if they could consider imposing the death penalty. Ms. Cottman, like most other jurors, responded with short and direct answers to the question posed. The state did not raise an issue as to her demeanor regarding any unwillingness by Ms. Cottman to answer questions during voir dire. Instead, the state first raised this issue in response to appellant's *Batson* challenge. If Ms. Cottman exhibited by her demeanor an unwillingness to answer the state's questions, this demeanor is not reflected in the record. A "strike based on vague references to attributes like demeanor are largely irrelevant to one's ability to serve as a juror and expose venirepersons to peremptory strikes for no real reason except their race." *State v. McFadden*, 191 S.W.3d 648, 655 (Mo. banc 2006); quoting *State v. Edwards*, 116 S.W.3d 511, 550 (Mo. banc 2003)(Teitelman, J., concurring). The state's vague allegation of an unfavorable demeanor is not apparent in the record and should not be considered a sufficient rebuttal to appellant's initial *Batson* objection. *Id.*

In light of the totality of the foregoing facts and circumstances, I am left with a definite and firm conviction that the trial court erred in overruling appellant's *Batson* challenge to the state's peremptory strike of Ms. Cottman. Therefore, I respectfully dissent from the principal opinion to the extent that it finds no *Batson* violation with respect to the state's per-

emptory strike of Ms. Cottman. The *Batson* violation requires the judgment to be reversed and the case to be remanded. I concur in all other parts of the principal opinion.

