In the
 Missouri Court of Appeals
 Western District

 
 STATE OF MISSOURI, 
  WD83362
 Respondent,  OPINION FILED:
 v. 
  AUGUST 3, 2021
 DANZEL REESE, 
 
 Appellant. 
 
 

 Appeal from the Circuit Court of Jackson County, Missouri
 The Honorable Joel P. Fahnestock, Judge

 Before Division One: Anthony Rex Gabbert, Presiding Judge,
 Edward R. Ardini, Jr., Judge, Thomas N. Chapman, Judge

 Danzel Reese appeals from a judgment entered upon a jury verdict convicting him of

involuntary manslaughter in the first degree under Section 565.024,1 and robbery in the first degree

under Section 569.020. Reese contends the circuit court, 1) plainly erred in overruling Reese’s

motion to strike Venireperson #33, arguing Venireperson #33 was a biased juror, 2) erred in failing

to order further jury deliberations and accepting the jury’s verdict and sentencing Reese for robbery

in the first degree, arguing the jury issued inconsistent verdicts, 3) erred in accepting the jury’s

 1
 All statutory references are to the Revised Statutes of Missouri, as updated through 2010, unless otherwise
noted.
verdict and sentencing Reese for robbery in the first degree in violation of Reese’s right to be free

from double jeopardy, 4) plainly erred in failing to sua sponte give a limiting instruction or declare

a mistrial during the State’s closing argument, arguing the State injected and argued facts not in

evidence, and 5) plainly erred in submitting an erroneous verdict directing instruction for

involuntary manslaughter in the first degree. We affirm.

 Background and Procedural Information

 Reese was charged by way of information on November 8, 2017, with one count of murder

in the second degree for the shooting death of Lance Rutter, and one count of robbery in the first

degree for, while acting alone or in concert with another, forcibly stealing a wallet from

Christopher Chavez while Reese or another participant in the crime was armed with a deadly

weapon. An amended information was filed on August 5, 2019, also charging Reese as a prior

offender under Section 558.016. The case proceeded to jury trial on August 5, 2019. On August

8, 2019, the jury found Reese guilty of the lesser included offense of involuntary manslaughter in

the first degree, and robbery in the first degree. On November 14, 2019, the court sentenced Reese

to concurrent terms of seven years for involuntary manslaughter, and twenty years for the robbery.

Reese does not challenge the sufficiency of the evidence to support his convictions. Trial evidence

will be discussed as necessary below to address Reese’s points on appeal.

 Point I – Motion to Strike Venireperson #33

 In his first point on appeal, Reese contends the circuit court plainly erred in overruling his

motion to strike Venireperson #33. He contends he was denied a fair and impartial jury when

Venireperson #33 was not struck as a juror, arguing that Venireperson #33 was unable to evaluate

the evidence fairly and impartially. Reese contends that a manifest injustice resulted when he was

found guilty by a jury that Venireperson #33 was part of.

 2
 Reese concedes that this issue was not included in his motion for new trial and is, therefore,

unpreserved. He requests plain error review. “Issues that were not preserved may be reviewed for

plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage

of justice has resulted from the trial court error.” State v. Baumruk, 280 S.W.3d 600, 607 (Mo.

banc 2009). “Review for plain error involves a two-step process.” Id. “The first step requires a

determination of whether the claim of error facially establishes substantial grounds for believing

that manifest injustice or miscarriage of justice has resulted.” Id. (internal quotation marks and

citation omitted). “If plain error is found, the court then must proceed to the second step and

determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.” Id.;

See Rule 30.20. All prejudicial error is not plain error, “and plain errors are those which are

evident, obvious and clear.” Baumruk, 280 S.W.3d at 607 (internal citations and quotation marks

omitted). Plain error review under Rule 30.20 is discretionary. State v. Brandolese, 601 S.W.3d

519, 526 (Mo. banc 2020). The appellant bears the burden of facially establishing substantial

grounds for believing that manifest injustice or miscarriage of justice has occurred. Id. Without

this showing, an appellate court should decline plain error review. Id.

 ‘The critical question in a bias challenge is whether the venireperson
 unequivocally indicated an ability to evaluate the evidence fairly and impartially’
 State v. Clark, 55 S.W.3d 398, 404 (Mo. App. 2001) (citation omitted). Where a
 potential juror equivocates about his or her ability to be fair and impartial, a trial
 court has a duty to make an independent inquiry. Id.; State v. Wheat, 775 S.W.2d
 155, 158 (Mo. banc 1989) (trial court’s duty of independent inquiry arises only
 where a venireperson equivocates about ability to be fair and impartial). ‘Where a
 venireperson’s answer suggests a possibility of bias, but upon further questioning
 that person gives unequivocal assurances of impartiality, the bare possibility of
 prejudice will not disqualify such rehabilitated juror nor deprive the trial court of
 discretion to seat such venireperson.’ State v. Bishop, 942 S.W.2d 945, 949
 (Mo.App.1997). Nonetheless, ‘[w]here a juror gives equivocal answers which
 reveal uncertainty as to his ability to be impartial, the absence of independent
 examination by a trial judge justifies a more searching review by an appellate court

 3
 of the challenged juror’s qualifications.’ State v. Roark, 784 S.W.2d 194, 197 (Mo.
 App. 1989).

State v. Clark-Ramsey, 88 S.W.3d 484, 488-489 (Mo. App. 2002).

 The qualifications of a prospective juror are not determined conclusively by
 a single response, but are made on the basis of the entire examination. The trial
 court is in the best position to evaluate a venireperson’s commitment to follow the
 law and is vested with broad discretion in determining the qualifications of
 prospective jurors. The ruling will not be disturbed on appeal unless it is clearly
 against the evidence and is a clear abuse of discretion.

Id. at 486 (internal quotation marks and citations omitted).

 Here, during voir dire for Reese’s trial, the prospective jurors were asked by the State if

anyone or someone close to them had been a victim of a violent crime, including robbery and

murder. Venireperson #33 stated that approximately five years prior, her daughter’s boyfriend was

murdered during a robbery in Oklahoma. Venireperson #33 and all other jurors who responded

that they or someone close to them had been impacted by a violent crime were asked to raise their

number card if they believed these prior events would affect their ability to be fair in Reese’s case,

or if they were not confident they could be “fair and impartial and put aside whatever their

experiences were with their own victimization or the victimization of somebody close to them.”

Venireperson #33 did not raise her card, thereby indicating that she was confident that she could

be fair and impartial in Reese’s case. Venireperson #33 also indicated during voir dire that she

presumed Reese was innocent of the crimes for which he was charged.

 During defense counsel’s examination of potential jurors, the following colloquy took

place between defense counsel and Venireperson #33:

 [DEFENSE COUNSEL]: … Juror Number 33, would you please stand? You
 know someone or you were personally affected by a
 violent crime?

 4
[VENIREPERSON 33]: Yes, it was my daughter’s boyfriend.

[DEFENSE COUNSEL]: Daughter’s boyfriend. And how long ago was that?

[VENIREPERSON 33]: It was about five years ago.

[DEFENSE COUNSEL]: I would imagine that you love your daughter and you
 feel for her when she suffered that loss, right?

[VENIREPERSON 33]: Right

[DEFENSE COUNSEL]: I imagine that was a traumatic experience for your
 daughter, right?

[VENIREPERSON 33]: Yes.

[DEFENSE COUNSEL]: And I imagine that’s therefore, a traumatic
 experience for you, right?

[VENIREPERSON 33]: Yes.

[DEFENSE COUNSEL]: So would you be thinking about that when you’re
 listening to the evidence in this case?

[VENIREPERSON 33]: Yes, I probably would.

[DEFENSE COUNSEL]: Because there is no dispute that there was a murder
 that occurred, okay? So that may invoke some
 emotions that you may remember with your
 daughter, correct?

[VENIREPERSON 33]: Yes.

[DEFENSE COUNSEL]: And that would impact your ability to consider the
 evidence in this case, right?

[VENIREPERSON 33]: It’s hard to answer that because I was there for parts
 of it to support my daughter, but I don’t know the
 particulars of the whole case. So I mean, I listened
 to things and hear things back and forth and it makes
 me maybe consider, think about that case and maybe
 what had happened, but to me it’s sort of different,
 but then it’s also removed from me a little bit.

 5
 [DEFENSE COUNSEL]: Do you think it would be fair to my client for you to
 be considering these things while you’re considering
 the evidence in this case?

 [VENIREPERSON 33]: Can you say that again?

 [DEFENSE COUNSEL]: Yeah, that wasn’t a very good question. I do that a
 lot. And if at any time I ask another bad question,
 which will happen, please stop and let me know, and
 I will do my best to reword it so we all have an
 understanding. Everybody okay with that? All right.

 So would it be fair to Danzel Reese who is pleading
 not guilty, and he is presumed to be innocent, would
 it be fair for you to be thinking about your daughter’s
 case, or your daughter’s trauma and considering that
 while you’re considering the evidence in this case?

 [VENIREPERSON 33]: It would not be fair to him, correct.

 [DEFENSE COUNSEL]: Thank you so much.

 At the close of voir dire, the parties requested that various potential jurors be struck for

cause. The defense requested that Venireperson #33 be struck for cause, and the State objected.

The court denied defense counsel’s request reasoning, “She was saying that she felt this is a very

different scenario.” Reese did not exercise a peremptory strike to exclude Venireperson #33 from

the jury, and Venireperson #33 served on Reese’s jury.

 On appeal, Reese argues that the circuit court plainly erred in denying his motion to strike

Venireperson #33 because Venireperson #33’s responses to questions during voir dire “clearly

suggest a possibility of bias and prejudice.” Further, that Venireperson #33 concluded during voir

dire “that it would not be fair to appellant for her to serve as a juror in his case considering that

appellant was presumed to be innocent and that she would be thinking of the other case and her

daughter’s trauma during the presentation of the evidence in appellant’s case.” Further, that

 6
“[Venireperson #33] clearly stated that it would not be fair to appellant for her to serve as a juror

on his case while she was thinking about the facts of the other case and her daughter’s trauma.”

 With regard to Venireperson #33’s past experiences, Venireperson #33 unequivocally

indicated that those experiences would not impair her ability to be fair in Reese’s case, and that

she could be fair and impartial and put aside those prior experiences. Her later responses to defense

counsel’s questioning wherein she stated that she would “probably” be thinking about her

daughter’s boyfriend’s case when listening to the evidence in Reese’s case did not negate her prior

unequivocal response or convert it to equivocal. Likewise, Venireperson #33’s indication that it

would be unfair to Reese “to be to be thinking about [her] daughter’s case, or [her] daughter’s

trauma and considering that while [she was] considering the evidence in this case” did not negate

her unequivocal indication that she could be fair and impartial in Reese’s case. To merely be

thinking about an event because it has similarities to another event is not the same as allowing

opinions regarding the first to influence opinions regarding the second. While Venireperson #33

stated she would “probably” be thinking about her daughter’s boyfriend’s case while listening to

the evidence in Reese’s case, she expressed that she could not say that it would impact her ability

to consider the evidence in Reese’s case due to the situations being different, the fact that she did

not know the particulars in her daughter’s boyfriend’s case, and because her daughter’s boyfriend’s

case was “removed” from her a little bit. She recognized, however, that it would be unfair to Reese

to allow any consideration of her daughter’s boyfriend’s case to affect her considerations in

Reese’s case. Contrary to Reese’s averments on appeal, Venireperson #33 never stated that this

would occur. Further, Venireperson #33 never told the court that that “it would not be fair to

appellant

 7
for her to serve as a juror in his case” as Reese contends.2

 We find that Reese fails to make a threshold showing that the circuit court plainly erred in

overruling Reese’s motion to strike Venireperson #33. Reese claims on appeal that Venireperson

#33 stated during voir dire that it would not be fair to Reese for her to serve as a juror; Venireperson

#33 never made this statement. Reese fails to mention or acknowledge in any fashion on appeal

Venireperson #33’s unequivocal indication during voir dire that her prior experiences would not

impair her ability to be fair in Reese’s case, and that she could be fair and impartial and put aside

those prior experiences. Reese fails to then explain how the statements Venireperson #33 actually

did make during voir dire negated Venireperson #33’s indication that she could remain fair and

impartial despite her prior experiences.3

 Point I is denied.

 Point II – Inconsistent Verdicts

 In his second point on appeal, Reese contends that the circuit court erred in failing to order

further jury deliberations, accepting the jury’s verdict and sentencing Reese for robbery in the first

degree. He argues that the jury’s guilty verdict on the charge of robbery in the first degree, and

not guilty verdict on the charge of felony murder in the second degree, were fundamentally

inconsistent and allowed Reese to be found guilty without requiring the jury to find every element

 2
 While Reese argues on appeal that reversal is required because Venireperson #33’s statements suggested a
possibility of bias and prejudice and she was never “rehabilitated” by the State or through direct examination by the
court, there was no need for rehabilitation where the responses elicited by defense counsel never contradicted
Venireperson #33’s prior indications that she could be impartial, unbiased, and presumed Reese’s innocence in spite
of her prior experiences.
 3
 “Under plain error review, the [appellant] still bears the burden of establishing manifest injustice if an
unqualified juror serves on a jury.” Brandolese, 601 S.W.3d at 530. “It is not the duty of this Court to become an
advocate for the appellant and comb through the entire record searching for the basis of claimed error.” State v.
Bradley, 8 S.W.3d 905, 906 (Mo. App. 2000).

 8
of the offense of robbery beyond a reasonable doubt. Reese contends that, in “acquitting” him of

felony murder, the jury necessarily found that the State had failed to prove at least one of the

elements beyond a reasonable doubt. Further, due to the language of the felony murder instruction

and Reese’s concession as to two of the central elements of this offense, the State’s failure to prove

all elements of the felony murder charge meant the jury also found that the State failed to prove

robbery in the first degree beyond a reasonable doubt. Reese argues that a conviction of robbery

in the first degree was, therefore, dependent on him also being convicted of second-degree felony

murder.

 “A claim of inconsistent verdicts requires an appropriate objection to be preserved for

appeal. To be preserved, the objection must be raised before the jury is discharged.” State v.

Young, 597 S.W.3d 214, 219-220 (Mo. App. 2019). Reese did not object to the verdicts at trial,

either before or after the jury was discharged. His claim is, therefore, unpreserved and may only

be reviewed for plain error. Id. As discussed above, Reese bears the burden of facially establishing

substantial grounds for believing that manifest injustice or miscarriage of justice has occurred so

as to warrant plain error review. State v. Nickels, 598 S.W.3d 626, 635 (Mo. App. 2020).

 We first note that Reese fails to acknowledge, much less attempt to distinguish, State v.

Young, 597 S.W.3d 214 (Mo. App. 2019) and cases cited therein which are highly instructive if not

dispositive of Reese’s claim.4 In Young, appellant Young claimed that the circuit court erred in

accepting the jury’s verdict as to unlawful use of a weapon and armed criminal action because they

were inconsistent with the jury’s decision to convict Young of involuntary manslaughter rather

 4
 Reese makes no mention of these cases in his appeal brief. Although the State cites these cases in its brief
and argues they are dispositive of Reese’s claim, Reese filed no reply brief to address the State’s arguments. Reese
was permitted to file a reply brief under Rule 84.04(g), as made applicable by Rule 30.06(a).

 9
than second-degree murder. Id. at 220. Like Reese, Young contended that the jury’s verdict of

involuntary manslaughter “constituted an affirmative finding of not guilty as to murder in the

second degree and this was inconsistent with finding of guilt as to [the other counts] which

contained similar elements.” Id. After setting forth the particular jury instructions given, we

explained:

 The charge of felony murder in the second degree, as charged and instructed
 in this matter required the jury to find that Hutson was killed as a result of the
 unlawful use of a weapon. However, involuntary manslaughter, which the jury
 determined Young was guilty of, did not require such a finding. Young posits that
 by finding Young guilty of involuntary manslaughter, the jury had to have first
 affirmatively acquitted him of murder in the second degree. The key difference
 between the instruction for felony murder in the second degree and the instruction
 for involuntary manslaughter was the element that Hutson’s death resulted from
 unlawful use of weapon. Young argues that because the jury acquitted him of
 murder in the second degree, the jury necessarily acquitted him of both the unlawful
 use of a weapon charge and the armed criminal action charge that was based on the
 unlawful use of a weapon charge. Therefore, Young asserts that the jury’s decision
 regarding the instructed offenses charged under Count I was inconsistent with its
 findings of guilt as to Count III and IV. Thus, Young argues that the finding of
 guilty as to Counts III and IV must be reversed.

 This argument both misconstrues the nature of a finding by a jury of guilt
 for a lesser included offense and also the deference to which we give jury verdicts.
 As the State notes, Missouri’s instruction for murder in the second degree is not
 ‘acquittal first.’ State v. Johnson, 284 S.W.3d 561, 574 (Mo. banc 2009).
 Missouri’s instructions allow for the jury to consider a lesser offense if it does ‘not
 find the defendant guilty of the greater offense.’ Id. There are multiple reasons
 why this may happen: the jury is deadlocked on guilt as to the greater offense, it
 may be the result of compromise, or an exercise of lenity by the jury.

 Although the jury considered the greater offense of murder in the second
 degree, it was not required to unanimously find that the State failed to prove all of
 the elements of that charge beyond a reasonable doubt and ‘acquit’ Young of that
 offense before it could consider the lesser-included offenses of voluntary and
 involuntary manslaughter. Instead, the jury instructions stated that ‘if you do not
 find the defendant guilty of’ the preceding greater offense, ‘you must consider
 whether he is guilty of’ the lesser offense. Thus, Young is incorrect in his premise
 that the verdicts were inconsistent based on his argument that the jury had
 affirmatively found him not guilty or acquitted him of unlawfully using a deadly
 weapon in failing to find him guilty of felony murder under Count I. Therefore, it

 10
 was not inconsistent for the jury to find him guilty of that offense in Count III and
 additionally Count IV which relied on the conviction under Count III. To the extent
 this appears logically inconsistent, our courts have accepted such a result as
 manifestations of jury members reaching a compromise or exercising lenity.

Id. at 221.

 In Young, we also distinguished the two cases relied on by Reese in making this claim --

State v. Owens, 270 S.W.3d 533 (Mo. App. 2008), and State v. Flemons, 144 S.W.3d 877 (Mo.

App. 2004) -- on the grounds that the juries in Owens and Flemons issued clear acquittals of the

predicate offenses. Young, 597 S.W.3d at 224. We explained that findings of guilt for unlawful

use of a weapon and armed criminal action were not dependent upon a finding of guilt as to murder

in the second degree. Id. No element of unlawful use of a weapon and armed criminal action

required a finding of guilt as to murder, and no instruction required the jury to find that those

charges could only be considered if Young was found guilty of murder in the second degree. Id.

We concluded that, while there may have been “intellectual inconsistency,” that did not prevent

the verdict from being entered and could easily be explained by jury compromise or lenity. Id. at

223-224. “Missouri courts have continually found that when a defendant is tried on a multiple

count charge involving crimes with different elements, the jury’s verdict does not have to be

logically consistent.” Id. at 223 (internal quotation marks and citations omitted).

 The rationale of Young applies here. Because the jury was not obligated to first acquit

Reese of second-degree murder before considering lesser included offenses, we cannot conclude

that the jury’s conviction on the lesser included offense of first-degree involuntary manslaughter

 11
means that the jury found the State failed to prove an element of second-degree murder; the jury

had the option of exercising leniency.5

 We find that Reese fails to make a threshold showing that the circuit court plainly erred in

failing to order further jury deliberations and accepting the jury’s verdict of robbery in the first

degree. He fails to show that the jury’s guilty verdict on the charge of robbery in the first degree,

and not guilty verdict on the charge of felony murder in the second degree, were inconsistent

necessitating sua sponte intervention by the court.

 Point II is denied.

 Point III – Double Jeopardy

 In his third point on appeal, Reese contends the circuit court erred in accepting the jury’s

verdict and sentencing him for first-degree robbery in violation of Reese’s right to be free from

double jeopardy. Reese argues that the jury’s decision to acquit him of second-degree felony

 5
 Even if Reese had “conceded” the second and third elements of second-degree murder, as Reese contends
on appeal but the record does not necessarily reflect, the jury was still asked to independently consider these elements
in relation to the evidence; the jury was under no obligation to accept Reese’s concessions or the State’s position as
to how the evidence related to any element. State v. Stewart, 560 S.W.3d 531, 533 (Mo. banc 2018).

 The jury could have also concluded that the State did not prove that Lance Rutter was killed “as a result of
the perpetration” of the robbery. The evidence at trial, in the light most favorable to the verdicts, was that Lance
Rutter and Christopher Chavez were sitting on the front porch of their residence in the early morning hours of August
7, 2010, relaxing after work and waiting for their laundry to finish. Reese, and a man identified by witness Terrell
Lewis as Jamaal Young, jumped onto the porch. Young held a gun in Chavez’s face and Reese held a gun in Rutter’s
face, demanding that Chavez and Rutter hand over any money they had. Chavez gave his wallet, which included
approximately $15, to Young. Rutter had nothing to give. Reese and Young then demanded that Chavez and Rutter
take them into the residence. Chavez was “frozen” and “didn’t really know what to do at that point in time.” Rutter
told Reese and Young that he was not taking them into the house. Chavez testified that Rutter was “getting really
loud, like loud enough to alert the neighbors,” and Chavez hoped that Rutter’s loudness would scare the gunmen away.
Chavez testified that Young “took off.” Thereafter, Reese “started backing away from [Rutter], but still had his gun
trained on him.” Reese “kept looking from where [Young] took off and back at [Rutter], and then he finally looked
away and shot. And then he [took] off running.” Given this evidence and the jury instructions, the jury could have
concluded that the robbery was complete when Young began running and Reese began backing away, and that Rutter’s
death did not result from the perpetration of the robbery but, rather, resulted from Reese’s reckless act of looking
away and shooting in Rutter’s direction.

 12
murder precluded the same jury from later convicting him of robbery in the first degree which he

contends constituted the same offense for double jeopardy purposes.

 Reese failed to raise this claim at trial or in his motion for new trial. As constitutional

claims are waived if not raised at the first opportunity, we may only review for plain error. State

v. Moore, 414 S.W.3d 580, 582 (Mo. App. 2013).

 ‘A criminal defendant's right to be free from double jeopardy is derived
 from the Fifth Amendment of the United States Constitution and applies to the
 states through the Fourteenth Amendment.’ State v. Reynolds, 502 S.W.3d 18, 25
 (Mo. App. E.D. 2016); U.S. CONST. amends. V and XIV. ‘The proper test for
 assessing whether successive prosecutions violate double jeopardy is the
 Blockburger test, also known as the “same-elements” test.’ State v. Daws, 311
 S.W.3d 806, 808 (Mo. banc 2010). Two charges constitute the same offense for
 double jeopardy purposes unless ‘each provision requires proof of a fact which the
 other does not.’ Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76
 L.Ed. 306 (1932). Article I, section 19 of the Missouri Constitution specifically
 protects against a defendant being retried for the same offense after acquittal. State
 v. Johnson, 245 S.W.3d 288, 293 (Mo. App. W.D. 2008).

Young, 597 S.W.3d at 225.

 Reese’s claim that he was subjected to double jeopardy hinges on the premise that he was

“acquitted” of second-degree felony murder. For the reasons explained above, he was not.

Although a conviction on the offense of involuntary manslaughter in the first degree, rather than

second-degree felony murder which was an option given the jury, would be considered an “implied

acquittal” on the second-degree murder charge for purposes of a retrial,6 this does not translate to

an actual acquittal in a case involving a single prosecution with multiple counts within the context

of one trial where the jury was not required to acquit on the greater offense before considering the

lesser.

 6
 See Green v. United States, 355 U.S. 184, 190-191 (1957).

 13
 In State v. Young, discussed above in Point II, Appellant Young also argued that he was

“acquitted” of a charge of murder in the second degree when the jury returned a guilty verdict of

involuntary manslaughter instead. Id. at 220. He then argued that the court erred in accepting the

jury’s verdict as to unlawful use of a weapon and armed criminal action, contending that the jury

finding him guilty of these offenses after his “acquittal” constituted double jeopardy because

“unlawful use of a weapon” was an element of second-degree murder. Id. at 225. In our Opinion

addressing Young’s claims, we reiterated that the jury was not required to acquit Young of the

greater charge of second-degree murder, or the specific elements within that charge, before it could

consider the lesser-included offense of involuntary manslaughter. Id. at 226. Further, that “[w]hile

murder in the second degree had within it the element of ‘unlawful use of a weapon’ there were

other elements not present in the elements of the crimes of unlawful use of a weapon or armed

criminal action making them factually distinct and, consequently, double jeopardy does not bar

punishment for both.” Id. We also expressly questioned the applicability of a successive

prosecution claim in cases involving a single prosecution with multiple counts within the context

of one trial. Id. at 225.

 The same rationale applies here.7 Reese does not address Young in his appeal, and declined

to file a reply brief addressing the State’s claim that the defendant in Young cited the same cases

Reese cites for support, with this court finding all such cases “easily distinguishable” from a case

where there was no true acquittal or retrial. Young, 597 S.W.3d at 226. Consequently, Reese fails

 7
 While Reese contends that the offense of second-degree felony murder and first-degree robbery “constitute
the same offense under Blockburger,” in part because “the only contested element of the second-degree felony murder
charge was the underlying felony of robbery in the first degree,” we noted in response to Reese’s second point on
appeal that the record does not necessarily reflect “concessions” as to the other two elements.

 14
to make a threshold showing that he was exposed to double jeopardy and that a manifest injustice

occurred in his case.

 Point III is denied.

 Point IV – Closing Argument

 In his fourth point on appeal, Reese contends that the circuit court plainly erred in failing

to sua sponte give a limiting instruction or, alternatively, declare a mistrial during the State’s

closing argument. Reese contends that the State injected and argued facts not in evidence

regarding the DNA evidence developed from the scene, and there is a reasonable possibility that

Reese would not have been convicted had the prosecutor not done so. This, Reese contends,

resulted in manifest injustice. Reese concedes that the prosecutor’s statement was not objected to

at trial and may only be reviewed for plain error.

 Courts especially hesitate to find plain error in the context of closing
 argument because the decision to object is often a matter of trial strategy, and in the
 absence of objection and request for relief, the trial court’s options are narrowed to
 uninvited interference with summation and a corresponding increase of error by
 such intervention. A conviction will be reversed based on plain error in closing
 argument only when it is established that the argument had a decisive effect on the
 outcome of the trial and amounts to manifest injustice.

 Moreover, both the state and the defense are entitled to argue reasonable
 inferences from the evidence. A trial court maintains broad discretion in the control
 of closing arguments. An argument does not require reversal unless it amounts to
 prejudicial error. Closing arguments must be interpreted with the entire record
 rather than in isolation.

State v. Edwards, 116 S.W.3d 511, 536-537 (Mo. banc 2003) (internal quotation marks and

citations omitted).

 At trial, the State presented the testimony of Terrell Lewis, who came forward after being

charged federally and informed law enforcement that he was with Reese the night Reese shot

Rutter. Lewis agreed to testify against Reese in exchange for a plea offer. Lewis testified that he

 15
was with Reese and two other people (Jamaal Young and Lavance Jones) on the night of the

murder, and the four of them planned to rob a drug dealer known to Reese. Reese was carrying a

semi-automatic handgun that fired Colt .45 auto rounds and had a laser sight and an extended

magazine. The four traveled to a place near a club at 38th and Main in downtown Kansas City to

meet the drug dealer and to rob him. The drug dealer never arrived. Lewis and Jones grew tired

of waiting and headed back to their car which was parked at the intersection of 38th and Baltimore.

As they waited, Reese called Lewis and advised that he and Young were going to find someone

else to rob. From his location in the parked car, Lewis observed Reese and Young approach two

people who were sitting on a porch down the street. Lewis observed one of the people hand

something to Reese, and then saw Reese shoot the person on the left side of the porch. Reese and

Young ran back to the car and Reese said: “[G]o, go, I shot him.” Reese later stated that the

shooting victim “didn’t cooperate.”

 The police collected evidence from the scene which included a laser sight. Reese’s DNA

was found on that laser sight. Jennifer Howard, a DNA analyst at the Kansas City Police Crime

Laboratory, testified that Reese was the person who left the majority of the DNA on the laser sight.

She testified that while she could not determine when a person deposited DNA on an object, the

most common reason for DNA to be absent from an object after a person touches it is physical

removal from being wiped off, becoming wet, or being brushed up against. She testified that

although there was no way for her to definitively determine who the last person to touch the laser

sight was, it was possible that the last person to touch an item would have their DNA remain on

the item.

 In closing, defense counsel argued that the jury was being asked to assume what Terrell

Lewis knew, but no one could truly know because “you can’t trust a single thing that that man

 16
says.” The defense argued that Lewis’s testimony against Reese could not be trusted because it

was only being given to secure a lighter sentence for himself. The defense argued that, before the

jury ever considered the DNA evidence, it first needed to believe Terrell Lewis’s testimony, which

was impossible to believe. With regard to the DNA evidence, the defense argued:

 We learned from Jennifer Howard that there’s no test to determine how long
 someone’s DNA has been on an item. We learned from Jennifer Howard that DNA
 can stay on an item for a significant period of time. We learned from Jennifer
 Howard that one person can handle an item for an extended period of time and leave
 little to no DNA. And one person can handle an item for a short period of time and
 leave all kinds of DNA. There is no way to test to see if an item was handled by a
 specific person on a specific date.

 There’s no way to determine how someone’s DNA got on a specific item.
 We know that there are a minimum of four different people’s DNA on that laser
 sight, four. And that’s a minimum. And that’s only the stuff, the people that left
 DNA on them. We don’t know how many people touched that laser sight.

 Finally, finally, we learned from Jennifer Howard that Danzel Reese’s DNA
 was found nowhere else on the scene. Nowhere else on the scene was his DNA
 found.

During rebuttal, the prosecutor argued:

 Probably the most damaging to the defense and the most powerful is the
 DNA on that laser sight. Because when Danzel Reese – excuse me, when Terrell
 Lewis gives his statement initially to the police in April of 2011, he doesn’t know
 that DNA has actually already linked the defendant to this crime. And he didn’t
 know when he testified yesterday.

 He probably didn’t even realize that the laser sight was left behind. And we
 talk about what significance we can attach to that DNA evidence being found on
 the laser sight. The defense is correct. Ms. Howard is a scientist testified that she
 can’t say when DNA was put on an object. But Jennifer Howard, just like Terrell
 Lewis, is sitting in a witness chair. She doesn’t get to do what you all do.

 She doesn’t get to listen to the testimony of other witnesses, she doesn’t get
 to go to the crime scene, she doesn’t get to examine the photographs and things like
 that and make these decisions and say, you know what, I think the reason the DNA
 is on there is because the defendant’s guilty. That’s not her responsibility, and
 frankly, she wouldn’t be allowed to do that even if she wanted to.

 17
 But you folks are armed with the facts of the case. And the reality is, is a
 gun and a laser sight attached thereto that’s used in a murder and a robbery is not a
 gun that’s going to be preserved in laboratory-like conditions, right? This gun is
 going to be shoved in people’s shirts, in their pockets, shoved down their pants,
 shoved down the seat of a car, thrown in a trunk, under a mattress, under a pillow.
 These guns aren’t being preserved so that if somebody touches it a week ago, that
 DNA is going to remain pristine and there when it’s left at a crime scene, that’s not
 reality.

 Reason and commonsense tells us that. Reason and commonsense tell us,
 as Jennifer Howard explained, the most likely way that DNA gets wiped away is
 from being rubbed up against things, right? And there’s no question that laser sight
 and that gun had been all over the place. And the significance of that is the fact that
 the defendant’s DNA is the majority of the DNA on that laser sight tells you that
 the defendant was one of the very last people to touch that item.

 And when you couple that and what I mean by that is, if the claim is that
 the defendant touched something and then later on it’s taken somewhere else and
 left behind and ten people touched it between him and the scene, that can’t be true
 in real world circumstance where the gun is getting rubbed around and rubbed off.

 That means when the gun was produced, the last person to touch it is most
 likely the person that is going to have the majority of the DNA. And at the end of
 the day, ladies and gentlemen, it is not a coincident that 1 in 1.7 quintillion people,
 this is the one person whose DNA is the majority of the DNA on that sight. And
 that person just happens to be the individual that Terrell Lewis describes from the
 word go. Just like it’s not a coincidence that Terrell recites these facts that are
 independently corroborated by these other witnesses.

 At the end of the day, ladies and gentlemen, the reason that this evidence
 proves the defendant guilty is because there is no reasonable explanation for how
 Terrell Lewis could know the things he knew and how the physical evidence could
 continue to corroborate his account.

 Reese contends that the State’s closing argument was improper because there was no

evidence presented that the laser sight found at the crime scene had been handled in a manner in

which DNA would have been destroyed. Further, this “false premise” was used to “bolster the

prosecution’s further unsupported argument that it cannot ‘be true in the real world circumstance’

that appellant had earlier touched the laser sight and that his DNA remained on the item.” Reese

 18
argues that the prosecution also improperly argued that the last person who touched the laser sight

would leave the majority of the DNA on the sight. Reese contends that his substantive rights to

due process and a fair trial were violated by the State’s improper closing argument because he was

unable to present expert testimony to combat these unsupported assertions or rebut these

contentions in any manner. Consequently, the trial court’s failure to sua sponte issue a limiting

instruction to the jury or, alternatively, declare a mistrial was manifestly unjust, and the weakness

of the State’s case and the importance of the DNA evidence in the case results in the reasonable

probability that the verdict would have been different had the error not been committed. We

disagree.

 When Reese waited outside the club for the drug dealer he had arranged to meet and rob,

it can be inferred that he intended to rob the drug dealer in the same manner he robbed Rutter and

Chavez – by using his gun to compel compliance. As this was to be a surprise robbery, it is

unreasonable to believe that Reese had his gun drawn and not concealed in some fashion while

waiting for the dealer. The men were on foot after parking their car a few blocks from where the

robbery was to take place. According to Howard, rubbing and brushing against an item can destroy

surface DNA, as can the item getting hot or wet or being handled a lot. And, despite Howard

testifying that it is possible to handle an item for an extended period of time and leave no DNA,

she also testified that, “the longer you handle something the more likely you are to leave a profile.”

She testified that it was possible that DNA from one person on an item could be removed through

handling the item and the DNA of the last person who touched the item would remain; she testified

that the opposite could also be true. Despite Howard testifying that the opposite could also be true,

the State’s argument that Reese as the majority DNA contributor on the laser sight suggested that

he was the last to touch the laser sight was a reasonable inference drawn from Howard’s testimony.

 19
 Regardless, the real significance of the DNA was its actual presence on the laser sight that

was left at the scene of the crimes. Reese suggested to the jury that the State had not proven its

case because there was no way to tell when or how the DNA got on the laser sight, and there was

a minimum of four people’s DNA on that laser sight. Reese argued in closing that the jury first

had to believe Terrell Lewis before even considering the DNA, and suggested that the DNA was

insignificant without Terrell Lewis’s testimony. While this was not true, the State’s argument in

rebuttal explained that Reese’s DNA on the laser sight corroborated Lewis’s testimony that Reese

was in possession of a gun with a laser sight and shot Rutter. Moreover, even if the prosecutor’s

statements in closing regarding the handling of the gun and the implications that could be drawn

from Reese being the majority contributor of the DNA on the laser sight were improper, Reese

fails to explain how these statements negated the significance of Reese’s DNA on the laser sight

found at the scene of the crime, that Lewis observed Reese to be in possession of a gun with a laser

sight, and that Lewis observed Reese shoot someone with his gun. Consequently, he fails to show

that, even if the statements were improper, they had a decisive effect on the outcome of the trial.

 We find that Reese fails to show that the prosecutor’s statements in closing were not

reasonable inferences drawn from the evidence, or that even if they were not, the statements had a

decisive effect on the outcome of the trial.

 Point IV is denied.

 Point V – Involuntary Manslaughter Instruction

 In Reese’s fifth point on appeal, he contends the circuit court plainly erred to his prejudice

in submitting an erroneous verdict directing instruction for involuntary manslaughter in the first

degree, arguing that the instruction failed to define “recklessly” as required by MAI-CR 3d 313.10.

 20
 Reese was convicted of one count of involuntary manslaughter in the first degree. The

verdict directing instruction for this offense was patterned after MAI-CR3d 313.10 and

incorporated accessory liability under MAI-CR3d 304.04. Instruction No. 13 read:

 As to Count I, if you do not find the defendant guilty of murder in the second
 degree as submitted in Instruction No. 9 or Instruction No. 11, you must consider
 whether he is guilty of involuntary manslaughter in the first degree.

 As to Count I, if you find and believe from the evidence beyond a reasonable
 doubt:

 First, that on or about August 7, 2010, in the County of Jackson, State
 of Missouri, the defendant or another person caused the death of
 Lance Rutter by shooting him, and

 Second, that defendant or another person recklessly cause the death of
 Lance Rutter,

 then you are instructed that the offense of involuntary manslaughter in the first
 degree has occurred, and if you further find and believe from the evidence beyond
 a reasonable doubt:

 Third, that with the purpose of promoting or furthering the commission of
 that involuntary manslaughter in the first degree, the defendant
 aided or encouraged another person in committing the offense,

 then you will find the defendant guilty under Count I of involuntary manslaughter
 in the first degree.

 However, unless you find and believe from the evidence beyond a
 reasonable doubt each and all of these propositions, you must find the defendant
 not guilty of that offense.

 This instruction did not include the portion of MAI-CR3d 313.10, which defines

“recklessly” as follows:

 In determining whether the defendant recklessly caused the death of [name
 of victim], you are instructed that a person acts recklessly as to causing the death
 of another person when there is a substantial and unjustifiable risk he will cause
 death and consciously disregards that risk, and such disregard is a gross deviation
 from what a reasonable person would do in the circumstances.

 21
 Rule 28.02(c) provides that, whenever there is an MAI-CR instruction or verdict form

applicable under the law and Notes on Use, the MAI-CR instruction or verdict form shall be given

or used to the exclusion of any other instruction or verdict form. Rule 28.02(f) provides that, the

failure to give an instruction or verdict form in violation of Rule 28.02 constitutes error, with the

error’s prejudicial effect to be judicially determined, provided that an objection was timely made

under Rule 28.03. Rule 28.03 states that no party may assign as error the giving or failure to give

instructions or verdict forms unless a specific objection is made, “stating distinctly the matter

objected to and the grounds of the objection.” Further, the objections must be raised in a motion

for new trial. Here, Reese’s claim that the verdict directing instruction for involuntary

manslaughter in the first degree failed to define “recklessly” as required by MAI-CR 3d 313.10

was not raised at trial or in Reese’s motion for new trial. Reese concedes that this claim is,

therefore, unpreserved and may be reviewed for plain error only.

 “Instructional error rarely rises to the level of plain error.” State v. Scott, 278 S.W.3d 208,

212 (Mo. App. 2009). For a defendant to establish plain error from an instructional error, he “must

show more than mere prejudice and must show that the circuit court has so misdirected or failed

to instruct the jury that it is apparent to the appellate court that the instructional error affected the

jury’s verdict, and caused manifest injustice or miscarriage of justice.” Id. (internal citation and

quotation marks omitted). The appellant bears the burden of facially establishing substantial

grounds for believing that manifest injustice or miscarriage of justice has occurred. Brandolese,

601 S.W.3d at 526.

 We find that Reese fails to show substantial grounds for believing that manifest injustice

occurred in his case when the parties and the court omitted the MAI-CR 3d definition for

 22
“recklessly” from the instruction for involuntary manslaughter in the first degree. While he cites

State v. Ludwig, 18 S.W.3d 139 (Mo. App. E.D. 2000), as “instructive” and argues that “[h]ere, as

in Ludwig, the statutory definition of ‘recklessly’ substantially differed from its common usage

definition,” he makes no mention of State v. Matheson, 919 S.W.2d 553, 558 (Mo. App. 1996), a

case from this court that was distinguished in Ludwig, and makes no attempt to explain how

manifest injustice resulted on the facts of his case.

 Ludwig involved a defendant who elbowed an intoxicated man in the mouth causing him

to fall onto a picnic table and then to the ground. Ludwig, 18 S.W.3d at 141. The defendant then

punched the victim several times and grabbed him by the throat. Id. Just prior to this, the

defendant’s son advised that the intoxicated man had a gun. Id. The defendant told his son to get

the gun from the victim, and the son got on top of the victim. Id. The gun fired, killing the victim.

The defendant was charged with voluntary manslaughter. Id. At trial, the defendant asserted

defenses of both self-defense and accident. Id. Instructions were submitted to the jury on

voluntary manslaughter, involuntary manslaughter, and self-defense. Id. The jury returned a

guilty verdict of involuntary manslaughter. Id. at 142. The jury was not instructed as to the

definition of “recklessly” in the involuntary manslaughter instruction. Id.

 The Ludwig court acknowledged the well-settled principle that, if an instruction uses a

word in its ordinary, common-sense meaning, then no confusion occurs simply because the word

is not defined. Id. at 143 (citing State v. Dighera, 617 S.W.2d 524, 534 (Mo. App. 1981). Ludwig

also recognized that in State v. Matheson this court found that the definition of “recklessly” in the

MAI-CR 3d Notes on Use “is fully consistent with the lay definition of that word which defines

‘reckless’ as ‘lacking in caution’ and ‘marked by a lack of foresight or consideration: improvident,

negligent.’” 919 S.W.2d 553, 558 (Mo. App. 1996). (We further stated in Matheson that this

 23
conclusion was buttressed by the fact that MAI-CR 2d, in effect until 1987, did not define the term

“recklessly,” and no court ever found that the word should be defined because its use without

definition could confuse the jury. Id.) Ludwig distinguished Matheson on the facts present in

Ludwig’s case; the Ludwig court found manifest injustice when the jury was not instructed as to

the definition of “recklessly” in the involuntary manslaughter instruction because the failure to

give the instruction “would allow the jury to find defendant guilty of involuntary manslaughter if

his conduct was no more than carelessness or negligence.” Ludwig, 18 S.W.3d at 143.

 The same is not true here. Reese made no claim of accident or self-defense; Reese claimed

to have had no part in the robbery or shooting that killed Lance Rutter. He acknowledged in

opening argument, nevertheless, that “there’s no question Lance Rutter was killed during the

commission of a robbery.” Given the evidence, in convicting Reese of involuntary manslaughter

in the first degree, the jury concluded that Reese or his accomplice shot and killed Rutter; the

evidence showed that Reese was the trigger man. Significantly, the jury here actually had the

option of convicting Reese of involuntary manslaughter in the second degree, which contains the

element of criminal negligence. In that instruction, the jury was to, 1) first find that the defendant

or another person caused the death of Lance Rutter by shooting him, 2) second determine whether

“defendant or another person exhibited in the presence of one or more persons a weapon readily

capable of lethal use in an angry or threatening manner,” and 3) third, “that defendant or another

person was thereby criminally negligent.” “Criminally negligent” was defined as the “failure to

be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow and

such failure constitutes a gross deviation from the standard of care which a reasonable person

would exercise in the situation.” Unlike in Ludwig, there is no danger that the jury convicted Reese

of involuntary manslaughter in the first degree based on the lower mens rea found in negligence

 24
because the jury was presented this option and rejected it in favor of recklessness. To have found

Reese guilty of second-degree manslaughter, the jury would have had to conclude that Reese was

unaware that exhibiting the gun in an angry or threatening manner and shooting the gun in Rutter’s

direction presented a substantial and unjustifiable risk of death. By rejecting this option, we can

infer that the jury believed Reese to be aware that exhibiting the gun in an angry or threatening

manner and shooting the gun in Rutter’s direction presented a substantial and unjustifiable risk of

death. As “recklessly” is defined as there being a substantial and unjustifiable risk of death and a

conscious disregard for that risk, the lay definition of “lacking in caution” and “marked by a lack

of foresight or consideration” is still applicable. By rejecting the proposition that Reese was

unaware that his actions presented a substantial and unjustifiable risk of death, the jury essentially

determined that Reese was aware of the risk and disregarded it. We find no manifest injustice

obvious on the facts of this case, because there was no danger of the jury improperly convicting

Reese of involuntary manslaughter in the first degree based on a mens rea consistent with a lesser

offense.

 Point V is denied.

 Conclusion

 We conclude that Reese fails to make a threshold showing that the circuit court plainly

erred in overruling Reese’s motion to strike Venireperson #33. Reese fails to explain how the

statements Venireperson #33 made during voir dire negated Venireperson #33’s indication that she

could remain fair and impartial despite her prior experiences. Reese also fails to make a threshold

showing that the circuit court plainly erred in failing to order further jury deliberations. Reese fails

to show that the jury’s guilty verdict on the charge of robbery in the first degree, and not guilty

verdict on the charge of felony murder in the second degree, were inconsistent necessitating sua

 25
sponte intervention by the court. Reese additionally fails to make a threshold showing that he was

exposed to double jeopardy when the jury chose to convict him of first-degree involuntary

manslaughter rather than second-degree felony murder, and proceeded to convict him of robbery

in the first degree. We further find that the circuit court did not plainly err in failing to sua sponte

give a limiting instruction or declare a mistrial during the State’s closing argument. Reese fails to

show that the prosecutor’s statements in closing were not reasonable inferences drawn from the

evidence, or that the statements had a decisive effect on the outcome of the trial. Finally, we find

no manifest injustice in the verdict directing instruction for involuntary manslaughter in the first

degree that was submitted to the jury.

 The circuit court’s judgment is affirmed.

 Anthony Rex Gabbert, Judge

All concur.

 26